**In re Richard D. CICCHETTI, Former Judge and President Judge, Court of Common Pleas, Fourteenth Judicial District, Fayette County.**

Court of Judicial Discipline of Pennsylvania.

March 31, 1997.

---

## ORDER

PER CURIAM.

AND NOW, this 31st day of March, 1997, based upon the Opinion tiled herewith, IT IS HEREBY ORDERED:

That, pursuant to C.J.D.R.P. No. 503, the attached Opinion with Findings of Fact and Conclusions of Law be and it is hereby filed, and shall be served upon the Judicial Conduct Board and upon the Respondent,

That, either party may elect to file written objections to the findings and conclusions of the Court, stating therein the basis for those objections, provided that such objections shall be filed with the Court within ten (10) days of the date of the entry of this Order, and a copy thereof served upon the opposing party,

That, in the event such objections are tiled, the Court shall determine whether to entertain oral argument upon the objections, and issue an Order setting a date for such oral argument, and

That, in the event that timely objections are not filed within ten (10) days, or the Court decides that oral argument shall not be presented, this Court will issue an Order setting a date, pursuant to C.J.D.R.P. No. 504, for a hearing on the issue of sanctions.

Before McEWEN, P.J., and McCLOSKEY, CASSEBAUM, MAGARO, MESSA, SYLVESTER, WEINBERG and SWEENEY, JJ.

CASSEBAUM, Judge.

## I. *INTRODUCTORY SUMMARY*

The Judicial Conduct Board ("the Board") has filed a Complaint with this Court against

Former Judge Richard D. Cicchetti ("respondent"). The Complaint consists of twenty-five Counts which are based on the allegations of sexual harassment by four women-complainants (paragraphs 7–19 and 48–81 of the Complaint and Counts 1–8) and two alleged election law violations (paragraphs 82–121 of the Complaint and Counts 9–25). We find:

1. that the allegations of two of the complainants, Debra Hay and Mary Beth Hostert, relating, as they do, to conduct alleged to have occurred twenty-one years ago, in the one case, and thirteen or fourteen years ago, in the other, should not be considered,

2. that the Board did not sustain its burden of establishing by clear and convincing evidence the allegations made by Krista Miller,

3. that the Board did sustain its burden of proof regarding the allegations made by Heather Brueggman, and

4. that the Board has sustained its burden of proof on one of the two election law violations.

## II. *FINDINGS OF FACT*

### 1. *INTRODUCTORY*

1. Respondent is a former judge of the Court of Common Pleas for the Fourteenth Judicial District of Pennsylvania which encompasses Fayette County.

2. Respondent served as judge of that Court from January, 1974, to December 31, 1995, when he retired from judicial service.[1]

3. Respondent served as President Judge of that Court from January, 1978 until his retirement.

4. As President Judge, respondent had supervisory authority over all court employees of the Fayette County Court of Common Pleas, including the court reporters and the employees of the Adult Probation and Parole Office.

5. The Board filed a Complaint against respondent with the Court on July 1, 1996.

6. The Board divided the Complaint into three Parts.

Part A (paragraphs 7–81) recites allegations of misconduct made by six women. Prior to the trial, the Board withdrew the allegations made by two of the women (paragraphs 20–47). Part A is composed of Counts 1 through 8.

Part B (paragraphs 82–93) recites allegations in support of the charge that respondent, in his retention election effort of November, 1993, violated the Order of the Supreme Court of Pennsylvania dated June 29, 1987 and the Guidelines Regarding Political Activity by Court–Appointed Employees promulgated thereunder. Part B is composed of Counts 9 through 16.

Part C (paragraphs 94–121) sets out allegations in support of the charge that, respondent, in his retention election effort of November, 1993, formed the Committee to Retain President Judge Richard D. Cicchetti and the Committee filed two Campaign Expense Reports which set forth false and misleading information in violation of the Act of June 3, 1937 (P.L. 1333, No. 320 as amended) and that respondent executed an affidavit on each report attesting that, to the best of his knowledge and belief, the Committee had not violated said Act when, in fact, he knew that was untrue.

### 2. *PART A*

#### (i) *Debra Hay*

7. Debra Hay was a party to a divorce action before the respondent in 1975. She

---

1. It has been contended in other cases, that the jurisdiction of the Supreme Court to discipline a judge ends when the judge's judicial service ends. See, *Matter of Glancey*, 518 Pa. 276, 542 A.2d 1350 (1988); *Judicial Inquiry and Review Board v. Snyder*, 514 Pa. 142, 523 A.2d 294 (1987). The Supreme Court rejected this argument in both cases for the reason that "once instituted, our jurisdiction over disciplinary proceedings is thus only at an end when we issue a final order". *Snyder*, 523 A.2d at 299. These proceedings were instituted on July 25, 1995, when the Board formally notified Judge Cicchetti that a full investigation of his conduct had been authorized by the Board (Board Exhibit 7), well before Judge Cicchetti announced his retirement. See, also, the decision of this Court in *In re Chesna*, 659 A.2d 1091 (1995).

never had any contact with him before or after that litigation.

8. Debra Hay appeared before the respondent in one brief proceeding conducted on January 30, 1976.

9. The conduct of respondent about which Debra Hay complained and testified, i.e., sexually explicit remarks made over the telephone on eight to ten occasions by someone who "identified himself as Judge Richard Cicchetti" is alleged to have taken place in the three month period between December, 1975 and March, 1976, when the divorce litigation ended.

### (ii) Mary Beth Hostert

10. On January 4, 1982 Mary Beth Hostert became a member of the Pennsylvania State Police and, thereafter, she undertook and completed a five month training period and a 60 day "coaching" period while assigned to the State Police Barracks in Uniontown, Fayette County.

11. Sometime shortly after the completion of the coaching period she appeared before respondent as a witness in a case. She does not remember whether this appearance was in 1982 or 1983, nor the name of the defendant, the name of the assistant district attorney, the name of the defense lawyer, the docket number, the disposition of the case or whether it was civil or criminal.

12. She never had any contact with the respondent either before or after this one occasion.

13. She left her employment with the State Police in 1990.

14. She testified that in late 1982 or early 1983, during a ten minute conversation in respondent's robing room consisting of "basically just small talk", respondent inquired as to whether she would like to go with him to visit her parents' country home in Ligonier or to Seven Springs resort for a weekend.

### (iii) Krista Miller

15. Krista Miller was employed as a court reporter by the Fayette County Court of Common Pleas from early 1991 until June 15, 1993. During that time she worked for Judge Wagner of that Court. By letter dated June 15, 1993 Judge Wagner terminated that employment for reasons relating to the performance of the duties of her job.

16. The Board's Complaint avers that in late 1991 or early 1992 Ms. Miller and other court reporters attended a meeting with respondent to enlist respondent's support for computerization of the court reporters' equipment and that, at this meeting, respondent inquired "what's in it for me?" to the assembled court reporters, whereupon, responding, Ms. Miller jokingly said that, if respondent would support their request, she and the others would buy the respondent dinner. The Complaint then avers that later that day respondent called Ms. Miller in Judge Wagner's office asking if she was serious about having dinner with him.

17. At the trial Ms. Miller testified that she didn't know whether the meeting with respondent took place in late 1991/early 1992 or in late 1992/early 1993 but, whenever it was, she thereafter, over a period of six to nine months, received 15–20 telephone calls from respondent while she was in her office in the course of some of which respondent suggested they go out together.

18. During the period of her employment with Fayette County Ms. Miller had frequent, casual encounters with respondent in and about the courthouse. On none of these occasions did respondent suggest that Ms. Miller engage in a sexual relationship with him.

19. During the period of her employment with Fayette County and after the alleged meeting regarding computerization, Ms. Miller frequently called respondent's office or personally stopped in unannounced asking to see the respondent. These phone calls and visits had to do with both her courthouse duties and personal matters such as the apartment she was renting from respondent's son, detailing her car, and interviews she was having for a job in Philadelphia.

20. At no time did Ms. Miller report these phone calls or their content to Judge Wagner, to any of her fellow court reporters, or to any of her friends.

21. A few months before she left employment with Fayette County, Ms. Miller told Humphrey Lukachick, at the time Chief of County Detectives of Fayette County, that she had been receiving phone calls from respondent asking her to go out. Ms. Miller did not tell Mr. Lukachick that respondent ever made any sexual overtures to her or ever discussed anything of a sexual nature.

### (iv) *Heather Glover Brueggman*

22. In July, 1993, Heather Glover Brueggman began employment with the Fayette County Adult Probation Office. This was her first full time job after her graduation from Penn State University.

23. In Fayette County, at the time, one probation officer was assigned each judge and Heather Glover Brueggman was assigned to respondent.

24. She remained on that assignment until February, 1994, when she resigned after only eight months of employment with respondent.

25. Her job required her to be in respondent's courtroom whenever he was hearing criminal cases.

26. Respondent repeatedly called Ms. Brueggman into his robing room adjacent to the courtroom and spoke to her about personal matters such as:

— what kind of car she drove

— what she liked to do on weekends

— whom she dated

— how many boyfriends she had

— if it was true blondes had more fun

— whether they could get together

27. On one of these occasions, while respondent was showing Ms. Brueggman the stained glass windows in the courtroom, he put his arm around her and told her to think about getting together over the weekend. On the following Monday, respondent called her and asked if she had thought about getting together and she told him she did not want to do that.

28. Respondent telephoned Ms. Brueggman frequently upon which occasions he:

— repeatedly importuned her to get together with him after giving her a weekend to think it over; and when she said "no",

— asked her if she knew how powerful he was and that he could get anybody in the county to do anything he wanted.

29. On one occasion respondent invited Ms. Brueggman to his chambers for lunch at which time he remarked about her build, asked if she wanted to go to law school or become a magistrate and told her he could help her in either case.

30. Respondent proposed that he and Ms. Brueggman visit the home of Harry Fike, Fayette County Controller, who had a hot tub.

31. Respondent persistently endeavored to coerce Ms. Brueggman to engage in a sexual relationship with him and her persistent refusal to do so resulted in:

— respondent's making Ms. Brueggman's job performance difficult and then advising her that he could change things if she agreed to get together;

— respondent's statement to Ms. Brueggman that he could have her father fired from his job with Penn-Dot, and his intimation that he would do so unless she agreed to get together.

32. Ms. Brueggman's father was employed by PennDot at the time.

33. Shortly after Ms. Brueggman commenced working for respondent she started reporting to her fiancee (now husband) that the respondent was calling her and asking her to get together with him. She reported this to her fiancee on numerous occasions.

34. On the first Monday of hunting season in 1993, Ms. Brueggman told her father of respondent's repeated suggestions to her and that she was being harassed.

35. Ms. Brueggman's father then complained to Fayette County Controller, Fike, about the treatment his daughter was receiving from respondent.

36. Joseph Guynn was employed by the Fayette County Adult Probation Office from

June 27, 1993 to June 27, 1995 and shared an office with Heather Brueggman while she was employed by the County, i.e., from July, 1993 until February, 1994.

37. Mr. Guynn was present in the office many times when Ms. Brueggman received telephone calls from respondent and she discussed the calls with him "pretty much daily". Mr. Guynn believed the phone calls appeared to make her nervous and that she did not want to receive them.

38. Joseph Semansky was also an employee in the Probation Office of Fayette County and occupied an office adjacent to the office of Ms. Brueggman.

39. Two or three months after Ms. Brueggman came to work in the office she told Mr. Semansky that respondent put his arm around her when she was in court that morning and advised her that her job could be easy and she could possibly be appointed district justice, which conversation had made her uncomfortable.

40. On another occasion, Ms. Brueggman told Mr. Semansky that respondent wanted her to join him in Harry Fike's hot tub and that she felt that her father's employment with PennDot was threatened if she refused the invitation. During this conversation the telephone rang and she visibly jumped, her face turned white and she said, "My God, I hope it's not him."

41. Ms. Brueggman also discussed respondent's conduct with Tim Fazenbaker, a fellow probation officer, Charles Hoone, her supervisor, and Larry Rosenberger, the Warden of the Fayette County Jail.

42. Ms. Brueggman reasonably regarded respondent's conduct as harassing, coercive, and threatening.

43. Ms. Brueggman resigned from her job because of respondent's harassment and threats.

3. *PART B*

44. Respondent stood for retention as judge during the general election held on November 2, 1993.

45. Respondent formed a campaign committee in 1993 which was designated as the "Committee To Retain President Judge Richard D. Cicchetti" ("the Committee").

46. In 1993 Pandalyn Forrest served as court reporter for respondent.

47. In 1993 Roberta Meese was Deputy Court Administrator of Fayette County.

48. In 1993 Thomas McDowell was Chief Court Constable for Fayette County.

49. At the time of the retention election of 1993 Pandalyn Forrest, Roberta Meese, and Thomas McDowell were "court-appointed employees" as defined in the Guidelines Regarding Political Activity by Court–Appointed Employees, promulgated by Order of the Supreme Court of Pennsylvania dated June 29, 1987 and in effect during 1993.

50. At respondent's request, Pandalyn Forrest served as Treasurer of the Committee to Retain Richard D. Cicchetti.

51. Roberta Meese did not serve the Committee in any official capacity but did, at respondent's request, cash three checks drawn on the Committee's bank account in the aggregate amount of $1500 and deliver the cash to respondent.

52. Thomas McDowell did not serve the Committee in any official capacity but did, at respondent's request, endorse two checks payable to him drawn on the Committee's bank account in the aggregate amount of $1140.

53. McDowell does not remember cashing the checks or what he did with the cash, but he did not keep it.

54. The Supreme Court's Guidelines Regarding Political Activity by Court–Appointed Employees promulgated by Order of June 29, 1987 provide:

*Guidelines Regarding Political Activity by Court–Appointed Employees*

1. *Definitions.*

(a) The term "partisan-political activity" shall include but is not limited to, running for public office, serving as a party committee-person, working at a polling place on Election Day, performing volunteer work in a political campaign, soliciting contributions for political

campaigns, and soliciting contributions for a political action committee or organization, but shall not include involvement in non-partisan or public community organizations or professional groups.

(b) The term 'court-appointed employees' shall include, but is not limited to, all employees appointed to and who are employed in the court system, statewide and at the county level, employees of the Administrative Office of Pennsylvania Courts, Court Administrators and their employees and assistants, court clerks, secretaries, data processors, probation officers, and such other persons serving the judiciary.

2. *Prohibition on Partisan Political Activity.*

Court-appointed employees shall not be involved in any form of partisan political activity.

3. *Termination of Employment.*

Henceforth, a court-appointed employee engaging in partisan political activity shall cease such partisan political activity at once or shall be terminated from his or her position. In the event an employee chooses to become a candidate for any office, such employee shall be terminated, effective the close of business on the first day of circulating petitions for said office.

4. *President Judge.*

The President Judge of each appellate court or county court of common pleas shall be responsible for the implementation of these guidelines and shall be subject to the review of the Judicial Inquiry and Review Board for failure to enforce.

55. Neither Pandalyn Forrest, Roberta Meese, nor Thomas McDowell engaged in the proscribed partisan political activity in respondent's campaign for retention in 1993.

4. *PART C*

56. Findings of Fact Nos. 44, 45 and 50–53 relate to the charges contained in PART C of the Board's Complaint (as well as to PART B) and are incorporated here.

57. On November 1, 1993 the Committee issued three checks: one in the amount of $600 payable to Roberta Meese, one in the amount of $500 payable to Jammie Gammon, and one in the amount of $400 payable to Ann Raymond—a total of $1500. Jamie Gammon is Roberta Meese's daughter and Ann Raymond is Roberta Meese's mother.

58. Roberta Meese cashed the checks and delivered the cash to respondent.

59. On November 22, 1993 the Committee filed a Campaign Expense Report with the Bureau of Commissions, Elections and Legislation of the Commonwealth of Pennsylvania for the period October 9, 1993 to November 17, 1993. (Board Exhibit 3)

60. On page 10 of the Report the Committee stated that Meese, Gammon and Raymond were paid the $1500 to reimburse them for the purchase of "Party Supplies".

61. That information was false inasmuch as Meese, Gammon and Raymond did not purchase party supplies and received no money from the Committee.

62. On October 20, 1993 the Committee issued a check in the amount of $600 payable to Thomas McDowell.

63. On page 10 of the Report the Committee stated that McDowell was paid $600 to reimburse him for the purchase of "Party Supplies".

64. That information was false inasmuch as McDowell did not purchase party supplies and in fact received no money from the Committee.

65. On January 7, 1994 the Committee issued a check in the amount of $540 payable to Thomas McDowell.

66. On January 13, 1994, the Committee filed a Campaign Expense Report with the Bureau of Commissions, Elections and Legislation of the Commonwealth of Pennsylvania for the period November 18, 1993 to January 10, 1994. (Board Exhibit 4)

67. On page 8 of the Report, the Committee reported that McDowell was paid $540 to reimburse him for "Transportation".

68. That information was false inasmuch as McDowell did not provide transportation

and, in fact, received no money from the Committee.

69. Respondent executed the affidavit portion of these two Reports attesting that, to the best of his knowledge and belief, the Committee had not violated the Act of June 3, 1937 (P.L. 1333, No. 320) as amended.

70. At the time he executed the affidavits on these Reports, respondent knew the above specified information relating to the payments to Meese, Gammon, Raymond and McDowell was false and that the execution of the false affidavits constituted a violation of the Act of June 3, 1937 (P.L. 1333, No. 320) as amended.

## III. *DISCUSSION*

The amendment to the Constitution of Pennsylvania of 1993 established the Judicial Conduct Board and this Court, and provided certain specific instructions for the conduct of proceedings before this Court:

> All hearings conducted by the court shall be public proceedings conducted pursuant to the rules adopted by the court and in accordance with the principles of due process and the law of evidence. Parties appearing before the court shall have a right to discovery pursuant to the rules adopted by the court and shall have the right to subpoena witnesses and to compel the production of documents, books, accounts and other records as relevant. The subject of the charges shall be presumed innocent in any proceeding before the court, and the board shall have the burden of proving the charges by clear and convincing evidence.

Pa.Const. Article 5, § 18(b)(5).

The Pennsylvania Supreme Court has defined clear and convincing evidence as follows:

> The witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue ... It is not necessary that the evidence be uncontradicted ...

provided it "carries a clear conviction to the mind" or "carries a clear conviction of its truth".

*In re Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883, 886 (1986). See, also, *In re LaRocca's Trust Estate*, 411 Pa. 633, 640, 192 A.2d 409, 413 (1963).

1. *PART A*

The Board has charged that the harassing conduct set out in Part A of the Complaint constitutes:

1. misconduct in office (Count 1),
2. such that prejudices the proper administration of justice (Count 2),
3. such that brings the judicial office into disrepute (Count 3),
4. a violation of Canon 1 of the Code of Judicial Conduct (Count 4),
5. a violation of Canon 2 of the Code of Judicial Conduct (Count 5),
6. a violation of Canon 3A(3) of the Code of Judicial Conduct (Count 6),
7. a violation of Canon 3A(4) of the Code of Judicial Conduct (Count 7),
8. a violation of Article V, § 17(b) of the Pennsylvania Constitution (Count 8).

(i) *Debra Hay, and (ii) Mary Beth Hostert*

■ At the conclusion of the trial of this matter, the Court expressed great concern about the great length of time between the year of the incidents of sexual harassment that were alleged by complainants Debra Hay and Mary Beth Hostert and the year of the Complaint which the Board filed based on those allegations. In the case of Debra Hay, twenty years had intervened since respondent allegedly made sexually explicit remarks to her; in the case of Mary Beth Hostert, thirteen years had intervened since her single encounter with respondent. We need not consider the validity of the argument that the quality and quantity of the evidence presented by the Board requires a finding in favor of respondent with respect to the charges of these two complainants since we conclude that to even consider these charges would violate both the fundamental concepts of fairness which have guided our

jurisprudence for centuries, and the specific procedures which the Board has established to govern its investigations.

■ We note that the age of the complaints against respondent does not, by itself, implicate respondent's right to due process. It is settled in Pennsylvania that judicial disciplinary proceedings are not criminal in nature, and thus the full panoply of rights provided under the Sixth Amendment to the United States Constitution—such as the right of confrontation—are not expressly guaranteed to respondent. *Keiser v. Bell,* 332 F.Supp. 608 (E.D.Pa.1971). Nonetheless, judges are afforded the full benefit of the procedural due process protections of the Fourteenth Amendment, which, "though a variable and elusive concept, in its basic essence means a fair process." Cohn, *The Limited Due Process Rights of Judges In Disciplinary Proceedings,* 63 Judicature 232, 235 (1979). These protections include the right to discovery and the privilege against self-incrimination, Cohn, *Id.* at 238–40, and are derived from the liberty and property interests judges are recognized to have in their offices. *Shamen, et al., Judicial Conduct and Ethics,* § 13.09 at 448. Fundamental fairness, therefore, is a concept that pervades the judicial disciplinary process.

In relating this abstract concept of "fairness" to the issue of whether Hay's and Hostert's allegations are too remote in time for consideration, we adhere to the view that it is proper and appropriate to measure the consideration we afford the respondent against, among other things, the vigor with which the complainants have acted. Well over a century ago, John Stuart Mill observed that

> the idea of justice supposes two things—a rule of conduct and a sentiment which sanctions the rule. The first must be supposed common to all mankind and intended for their good. The other (the sentiment) is a desire that punishment may be suffered by those who infringe the rule. *There is involved, in addition, the conception of some definite person who suffers by the infringement, whose rights (to use the expression appropriated to the case) are violated by it.*

Mill, *Utilitarianism,* Chapter 5 (emphasis added). Thus, the more we must search to find the "definite person who suffers by the infringement" of the respondent, the less weight justice requires us to give to the merits of the claims.

In this regard, we note that had Hay and Hostert made their assertions—presumably in the form of an action for tortious infliction of emotional distress—in a private civil action against respondent, they would have been compelled to have filed them within two years of the underlying incidents.[2] These conceptions constrain us to carefully assess the ramifications of our consideration of allegations so remote in time.

■ We are aware that statutory limitations periods are not directly applied to disciplinary proceedings. *Wilhelm's Case,* 269 Pa. 416, 420–21, 112 A. 560 (1921). See, also, *The Florida Bar v. McCain,* 361 So.2d 700 (Fla.1978) and cases cited therein. Nonetheless, we do not accept—notwithstanding the Board's urging—that the inevitable corollary of this fact is that any evidence, however out of date, may be introduced against the respondent. We find the Board's reliance on homicide cases in which courts have allowed complaints filed many years after the underlying incident to be completely distinguishable from the present matter, inasmuch as statutes of limitations on murder cases are either very long or non-existent, precisely the opposite of the matter before us. Public policy favors allowing murder charges to be brought well after the event occurred, not only because the crime of murder is so heinous an offense but also because the nature of the crime of murder enhances the likelihood that details of the incident will be accurately recalled. Thus, the homicide cases to which the Board refers involve different considerations than those present here.

Further, the cases upon which the Board relies all involved continuing investigations by authorities of an existing criminal complaint coupled with a deliberate decision that

---

**2.** Other claims of gender discrimination and harassment, such as those brought under Title VII, must be raised within 180 days of the occurrence. 42 U.S.C. § 2000e–5(e).

charges could not be filed based upon the complaint until a key witness finally came forward or important evidence was discovered. *Commonwealth v. McCauley,* 403 Pa.Super. 262, 588 A.2d 941 (1991); *Commonwealth v. Patterson,* 392 Pa.Super. 331, 572 A.2d 1258 (1990); *Commonwealth v. Akers,* 392 Pa.Super. 170, 572 A.2d 746 (1990). The situation created by the allegations of Hay and Hostert is very different, given that (1) no civil or criminal body was reviewing the facts of their claims before they came forward, and (2) Hay and Hostert are the complainants, not merely corroborative witnesses, who nonetheless chose to keep silent about facts within their sole possession.[3]

■ A no less fundamental, and even more domestic, obstacle to undertaking a consideration of the merits of the complaints of Ms. Hay and Hostert, however, arises from Judicial Conduct Board Rule of Procedure 15, which provides:

> Except where the Board determines otherwise for good cause, the Board shall not consider complaints arising from acts or omissions occurring more than four years prior to the date of the complaint, provided, however, that when the last episode of an alleged pattern of recurring judicial misconduct arises within the four-year period, the Board may consider all prior acts or omissions related to such an alleged pattern of conduct.

This Rule, in clear and certain terms, precludes the Board from presentation of the allegations of Ms. Hay and Ms. Hostert—which indisputably involved "acts or omissions occurring more than four years prior to the date of the complaint"—unless the allegations supported "an alleged pattern of recurring judicial misconduct" or if it otherwise determined "good cause" existed to do so.

■ The Board has not attempted to show this Court that either of these exceptions to the Rule applies in this case, and, to the

contrary, has taken the position that its decision to proceed with the allegations is entirely within the Board's discretion and is not reviewable by this Court. We reject this argument, because it is contradicted both by our own rules of procedure and by the Pennsylvania Supreme Court. Court of Judicial Discipline Rule 411(D) clearly provides that the respondent is permitted to challenge the Board's charges on the ground that the Board "violated the procedures governing it." The Pennsylvania Supreme Court has recently sustained this Rule against the Board's contention that the Rule was "clearly unconstitutional since the Court of Judicial Discipline's rule-making authority is limited to adopting rules which govern the conduct of the hearings before it," and that the Court of Judicial Discipline had no right or authority to review the Board's compliance with its own rules. *In re Hasay,* 546 Pa. 481, 686 A.2d 809 (1996). The Supreme Court, observing that the Board was created in order to do away with the secrecy that had governed the prior Judicial Inquiry and Review Board, held:

> We emphatically reject the assertion that the board's compliance with its rules of procedure is absolutely beyond judicial review. The rules exist in part to insure that due process is accorded judicial officers subject to investigation and prosecution by the board.... Every minor or technical violation of the board's rules may not be a denial of due process, and the appropriate remedy may be a minor matter; nonetheless, the guarantee of due process requires that the board's procedures be reviewable.

686 A.2d at 816–17.

We therefore find that reviewing the Board's compliance with its Rule 15 is a matter within our purview—indeed, it is our duty—and that in this case the Board did not comply, as it has failed to show that the Hay

---

**3.** We note that in the one case cited by the Board that does not involve a murder charge, *Commonwealth v. Lane,* 521 Pa. 390, 555 A.2d 1246, 1250 (1989), the Pennsylvania Supreme Court was much less willing to consider the merits of a charge that was not filed promptly, holding that, in a case of rape and indecent assault, "[t]he lack of a prompt complaint by a victim of a crime,

although not dispositive of the merits of the case, may justifiably produce a doubt as to whether the offense indeed occurred, or whether it was a recent fabrication by the complaining witness." This situation is much closer to the type of allegations made by Hay and Hostert than the murder cases upon which the Board principally relies.

or Hostert allegations are either part of a pattern of misconduct or that they otherwise had good cause to review them.[4] Since the enactment of the Civil Rights Act, federal courts have frequently been called upon to determine whether, under Title VII of that Act, 42 U.S.C. § 2000e–6(e), a "pattern or practice" of discriminatory conduct existed. The United States Supreme Court has held that a "pattern and practice" requires "something more than an isolated, sporadic incident, but is repeated, routine, or of a generalized nature." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 n. 16, 97 S.Ct. 1843, 1855 n. 16, 52 L.Ed.2d 396. (1977).

Applying this standard to the present matter by analogy, the conclusion is inescapable that the incidents described by Hay and Hostert do not demonstrate routine or repeated conduct on the part of respondent. Hostert alleges one incident, lasting a matter of a few minutes, eight years removed in time from the conduct described by Hay. Both of these occurrences are claimed to be a decade or more prior to the other two incidents referred to us by the Board. The allegations by Hay and Hostert are thus too remote in time, and too brief in occurrence, to sustain any possibility of being linked in a common pattern to any other conduct by respondent.

Moreover, after hearing the testimony presented at the trial, we are persuaded that the Board has attained in but one case the standard of proof imposed upon it, namely, that it establish a violation by clear and convincing evidence. Certainly, one episode does not constitute a "pattern." Nor, as noted, is this holding inconsistent with the earlier, pre-trial ruling of the Conference Judge denying respondent's motion to preclude the Board from presenting testimony of conduct more than four years old. That ruling reserved to the Board the opportunity to establish a pattern or good cause. The Board, quite simply, failed to do so.

There is no other evidence in the record that would support the conclusion that "good cause" exists to consider the Hay and Hostert incidents notwithstanding their remoteness in time. If anything, the problems attendant upon the decades of delay in presentation, such as, and in particular, the diminished memories of the witnesses, including the complainants, militate against consideration. This is demonstrated in the record on a number of occasions, including the following:

1. Q: Did you give her any advice as to what to do about that?

 A: I really don't remember what my reaction was. I tend to think I just kind of made light of it and tried to blow it off. It's really too long ago for me to remember exactly what my reaction was.

Testimony of Venick, Hostert corroborating witness, T.N.T. p. 126.

2. Q: So if your Master's hearing was of December 4, 1975 and you indicate that you were treating with a Dr. D'Angeles of Connellsville, Fayette County and he prescribed you nerve pills, that would be inaccurate. Is that what you're telling us?

 A: You see, there, we're talking 20 years ago. Dr. D'Angeles has been dead. You know, I haven't even heard that name. He probably passed away then right after he seen me. I have no recollection of even seeing him.

Testimony of Hay, T.N.T. p. 159.

3. Q: Are you testifying from memory, or are you testifying about what you know from the docket?

---

4. As the Board relied, at the hearing, on its procedural argument and did not attempt to show compliance with these requirements, this holding is sufficient. We nonetheless go on to consider the merits of the Board's compliance with Rule 15, because we denied, prior to the hearing, respondent's motion to dismiss the Hay and Hostert allegations on the ground that the Board failed to comply with Rule 15. We did so, relying upon the Board's *averment* of a pattern of misconduct, because we were reluctant, at that stage, to foreclose the Board from putting forth evidence that would support a finding that Rule 15 was complied with. We have now determined that it has failed to do so.

A: I'm absolutely testifying only from what I know from the docket, sir. I have no memory.

Testimony of Watson, Hay's attorney in 1975, T.N.T. p. 292–93.

4. Testimony of Board investigator Garrity as to his unsuccessful attempts to corroborate Hostert's allegations by searching the Fayette County records of 1982, T.N.T. p. 311–16.

■ Such vague, uncertain testimony is, on its face, so deficient as to render the charges void. Moreover, such outdated assertions of misconduct are rendered voidable by the doctrine of laches, a defense available in a disciplinary proceeding. See, *Office of Disciplinary Counsel v. Davis,* 532 Pa. 22, 614 A.2d 1116 (1992); *Wilhelm's Case, supra.*

### (iii) *Krista Miller*

■ We conclude that the evidence offered by the Board in support of the charges relating to respondent's conduct toward Krista Miller does not meet the clear and convincing standard which the Board is obliged to attain since:

1. Her testimony was contradicted in material respects;
2. During the six to nine months she alleged she was receiving the 15 to 20 offending telephone calls, she initiated frequent personal contacts with respondent.
3. Her reason for leaving her job as Judge Wagner's court reporter had nothing to do with her relationship with respondent.

### (iv) *Heather Brueggman*

On the other hand, we find that the Board did establish by clear and convincing evidence that respondent's conduct toward Heather Brueggman constituted a violation of Article V, § 18(d)(1) in that the conduct is such that "brings the judicial office into disrepute".

Since the Board has structured its Complaint by first recounting the allegations of all four complainants and then reciting eight Counts averring violations of various provisions of the Constitution and the Canons of Judicial Conduct, it is difficult to be certain which Counts were intended to apply to the allegations of which complainant. Nonetheless, proceeding with an abundance of caution as well as with concern for the prerogatives of the Board and the rights of the respondent, we will treat the eight Counts in the order in which the Board has recited them in the Complaint.

> *Count 1* The Respondent has engaged in misconduct in office.

The Pennsylvania Constitution states that:

> A justice, judge or justice of the peace may be suspended, removed from office or otherwise disciplined for ... *misconduct in office* ...

Pa. Const. Art. V, 18(d)(1) (emphasis added).

■ The Constitution does not, however, undertake to define "misconduct in office" so we look elsewhere for guidance. This Court, in the case of *In re Hasay,* 666 A.2d 795 (Pa.Ct.Jud.Disc.1995), *aff'd in part, rev'd in part* 546 Pa. 481, 686 A.2d 809 (1996), had occasion to address charges of "misconduct in office" and relied upon the definition of the common law crime of misconduct in office pronounced by our Superior Court in *Commonwealth v. Green,* 205 Pa.Super. 539, 546, 211 A.2d 5, 9 (1965):

> The common law crime of misconduct in office, variously called misbehavior, misfeasance or misdemeanor in office, means either the breach of a positive statutory duty or the performance by a public official of a discretionary act with an improper or corrupt motive.

This Court, in *In re Timbers,* 668 A.2d 304 (Pa.Ct.Jud.Disc.1995), again considered the charge of "misconduct in office" but declined to adopt a specific definition of the offense. We now adopt the definition in *Commonwealth v. Green* with some clarification as follows:

> Misconduct in office means the breach, by a judicial officer of a positive statutory duty or the performance by a judicial officer of a discretionary act in the course of official action with an improper or corrupt motive.

This definition clarifies, but does not change, the *Green* definition. The definition we here adopt addresses two types of action by a judicial officer—indeed the only types of action he can take—discretionary and non-discretionary. "Breach of a positive statutory duty" is a failure to perform a non-discretionary act—all other acts by a public officer are discretionary and, in either case, in order to constitute "misconduct in office" the acts must be performed in the course of the official duties of the office.

We believe this to be the clear intendment of the Superior Court as well as other courts which have had occasion to address the question. For example, in *Clark v. Weeks,* 414 F.Supp. 703 (N.D.Ill.1976), a county treasurer sought to enjoin his removal from that office under an Illinois statute which made "misconduct in office" grounds for removal, arguing that the term was unconstitutionally vague. The United States District Court held that it was not impermissibly vague because the misconduct referred to in the statute was "misconduct in office" and must be related to the performance of official duties—as contrasted with "misconduct" in general which would be (and has been held to be) too vague. The District Court there stated:

The case law is clear that "misconduct in office" and its equivalent term "official misconduct", to warrant removal from office,

"... must have direct relation to and be connected with the performance of official duties and amount either to maladministration or to a willful and intentional neglect and failure to discharge the duties of the office at all. It does not include acts and conduct which, though amounting to a violation of the criminal laws of the state, have no connection with the discharge of official duties. The misconduct which will warrant removal of an officer must be such as affects his performance of his duties as an officer and not only such as affects his character as a private individual. In such cases it is necessary to separate the character of the man from the character of the office. The misconduct charged and established must be something which plaintiff

did, or did not do, in his official capacity." [Quoting from the opinion of the Supreme Court of Michigan in *Wilson v. Council of City of Highland Park,* 284 Mich. 96, 278 N.W. 778 (1938).]

*Id.,* at 707–708. The District Court then observed that:

This definition of "misconduct in office" to include only wrongful acts or wrongful failures to act in the performance of the duties of office has been consistently accepted by the courts. [Citing cases from Louisiana, California and New Jersey as well as the decision of the Pennsylvania Superior Court in *Commonwealth v. Green, supra.*]

*Id.* at 708. Finally, the District Court emphasized the difficulties which would result if the meaning of the term is not so limited.

Thus, the meaning of "misconduct in office" is substantially more specific than the meaning of the general term "misconduct" which has been found too vague to be a constitutional basis for imposing punishment ... [Citing the United States Supreme Court in *Giaccio v. Pennsylvania,* 382, U.S. 399, 404, 86 S.Ct. 518[, 521–22], 15 L.Ed.2d 447 (1966) and *Soglin v. Kauffman,* 418 F.2d, 163 (7th Cir.1969) ]

In all of these cases, the scope of the term "misconduct" was totally unconfined, and punishment could have been imposed under the statutes and regulations found overly vague for any imaginable sort of human behavior, "so long as the objectionable behavior could be called misconduct at some later date". *Soglin, supra.,* at 167. Considering the broad divergences of opinion in our pluralistic society over what constitutes proper behavior and what constitutes misconduct in many areas of behavior, there is no doubt that the unqualified term "misconduct" is a standard of conduct "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application ..." *Connally v. General Construction Co., supra.,* 269 U.S. [385] at 391, 46 S.Ct. [126] at 127[, 70 L.Ed. 322 (1926)].

*Id.* at 708.

 Since respondent's conduct relating to Heather Brueggman can in no way be

construed as relating to his performance or nonperformance of a discretionary or non-discretionary act in the course of his official duties, we conclude that the charge of misconduct in office has not been established.

> Count 2. The Respondent has engaged in conduct which prejudices the proper administration of justice.

 Conduct which prejudices the proper administration of justice consists of (1) misconduct, (2) committed with the intent to obstruct judicial proceedings, and (3) which obstructs the administration of justice. In this case none of the facts relating to respondent's conduct as it related to Heather Brueggman amounted to any obstruction of or interference with judicial proceedings. Moreover, in *In re Smith,* 687 A.2d 1229, 1237–38 (Pa.Ct.Jud.Disc.1996), we held that conduct prejudices the proper administration of justice only where there is a

> specific intent ... that the conduct would have a deleterious effect upon the administration of justice, for example, by affecting a specific outcome.

Since nothing in the record establishes these elements, we must conclude that respondent's conduct did not prejudice the proper administration of justice.

> Count 3. The Respondent has engaged in conduct which brings the judicial office into disrepute.

We also had the occasion in *In re Smith, supra,* at p. 1238–39, to determine whether a judge's delay in disposing of cases had brought the judicial office into disrepute. In the course of that opinion we reasoned:

> (1) it cannot be *presumed* that a violation of any other provision, constitutional, canonical or criminal *automatically* lowers public acceptance of the authority of the judicial office (emphasis added). *Id.* at p. 1238; and
>
> (2) "Disrepute" necessarily incorporates some standard with regard to the reasonable expectations of the public of a judicial officer's conduct. Even if a judicial officer's conduct could reasonably result in the

lessening of respect for that judge, it cannot be *assumed* that the same actions would necessarily bring the judicial office into disrepute. *Id.* at p. 1239 (emphasis added).

 The determination of whether particular conduct has brought the judicial office into disrepute, of necessity, is a determination which must be made on a case by case basis as the particular conduct in each case is scrutinized and weighed. As earlier noted, we decided in *Smith* that the respondent's delayed disposition of cases had not brought disrepute to the office itself. In *Smith,* we did, however, declare with certainty that:

> To sustain a charge under this Section, the Board must make a persuasive showing that (1) the judicial officer has engaged in conduct which *is so extreme* that (2) it has resulted in bringing the judicial office into disrepute. *Id.* at p. 1238 (emphasis added).

Since we find that, in this case, this respondent's behavior as it related to Heather Brueggman was so persistent, so coercive, and *so extreme* we conclude that disrepute was brought upon the judicial office itself.[5]

> Count 4. The Respondent has engaged in conduct in violation of a canon or rule prescribed by the Pennsylvania Supreme Court, to wit, Canon 1 of the Code of Judicial Conduct, which provides as follows: "A Judge should uphold the integrity and independence of the judiciary. An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective."
>
> Count 5. The Respondent has engaged in conduct in violation of a canon or rule prescribed by the Supreme Court, to wit, Canon 2 of the Code of Judicial

---

5. We note that the Constitution (Article V, § 18(d)(1)) provides that a judicial officer may be disciplined for conduct which brings the judicial office into disrepute "whether or not the conduct occurred while acting in a judicial capacity or is prohibited by law."

Conduct, which provides as follows: "A Judge should avoid impropriety and the appearance of impropriety in all his activities. A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. B. A judge should not allow his family, social or other relationships to influence his conduct or judgment."

*Count 6.* The Respondent engaged in conduct in violation of a canon or rule prescribed by the Supreme Court, to wit, Canon 3A(3) of the Code of Judicial Conduct, which provides as follows: "A. *Adjudicative Responsibilities* (3) A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity, and should require similar conduct of lawyers, and of his staff, court officials, and others subject to his direction and control."

*Count 7.* The Respondent engaged in conduct in violation of a canon or rule prescribed by the Supreme Court, to wit, Canon 3A(4) of the Code of Judicial Conduct, which provides as follows: "A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, must not consider ex parte communications concerning a pending proceeding."

■ Canon 1 and Canon 2, the subject of Counts 4 and 5, are directed at conduct which would impugn or detract from the "integrity and independence" (Canon 1) and the "integrity and impartiality" (Canon 2) of the judiciary. "Integrity" must be read *in pari materia* with "independence" in Canon 1 and with "impartiality" in Canon 2. Both of those words and both of these Canons exhort judges to carefully preserve all appearance of even-handedness, of not favoring or appearing to favor either side in a case, of being and appearing free from influence.

Consistently with this notion, "integrity" is defined as follows:

1: An unimpaired condition: SOUNDNESS

2: firm adherence to a code of esp. moral or artistic values: INCORRUPTIBILITY

3: the quality or state of being complete or undivided: COMPLETENESS *syn,* see HONESTY

Webster's New Collegiate Dictionary, 1993.

Moreover, our Supreme Court has held that:

Canon 1 is primarily a statement of purpose and rule of construction, rather than a separate rule of conduct. It requires that each of the other Canons be construed in accordance with the Code's fundamental purpose of ensuring both the independence and the integrity of the judiciary.

*In the Matter of Larsen,* Appendix I, 532 Pa. 326, 616 A.2d 529, 558 (1992). Recently we emphasized this concept in *Smith, supra,* at p. 1239, where we said as to Canon 1:

The language of Canon 1 is hortative and goal oriented, and does not set forth with specificity the precise nature of the conduct and standards to which it is aimed.

and where we stated as to Canon 2:

Canon 2 in general is directed towards conduct which could potentially cause the public or litigants to believe that a judge is not acting impartially.[6]

■ Thus we conclude that the conduct proscribed by Canons 1 and 2 does not include the conduct of respondent as it related to Heather Brueggman.

■ Finally, the Board contends that respondent's conduct with regard to Ms. Brueggman violated Canon 3 subsections A(3) and (4). However, Canon 3A, under which both subsections are included, is limited to the judicial officer's "Adjudicative Responsibilities". Since we believe the conduct at issue is unrelated to respondent's adjudicative responsibilities, we conclude that the

---

**6.** The instructions contained in subsection B. of Canon 2: that "a judge should not allow his family, social or other relationships to influence his judicial conduct or judgment" and that he should not "convey or knowingly permit others to convey the impression that they are in a special position to influence him", provide further support for this interpretation of Canon 2.

conduct does not constitute a violation of either subsection (3) or (4) of Canon 3A.

*Count 8.* The Respondent engaged in conduct in violation of Article V, § 17(b) of the Pennsylvania Constitution, in that, he has engaged in conduct in violation of Canons 1, 2, 3A(3) and 3A(4) of the Code of Judicial Conduct.

Since respondent's conduct did not constitute a violation of any of the Canons with which he was charged, it does not constitute a violation of Article V, § 17(b) of the Pennsylvania Constitution.

In summary, as to Part A, we find that the Board has established by clear and convincing evidence that the respondent's conduct as it related to Heather Brueggman brought the judicial office into disrepute as charged in Count 3.

### 2. *PART B*

In Part B the Board charges respondent with violation of various constitutional provisions and violation of various Canons of the Code of Judicial Conduct (Counts 9–15) all arising out of his alleged violation of the Order of the Supreme Court, 82 Judicial Administration Docket No. 1, dated June 29, 1987 and the Guidelines promulgated thereunder (Count 16).

The charges of the Board arise from the requests by respondent of three court-appointed employees to assist in his campaign for retention as judge in the general election of 1993. The Board charges respondent with violation of Section 4 of the Guidelines which requires the President Judge of each county Court of Common Pleas to enforce the Guidelines.

■ We conclude that respondent did not violate Section 4 of the Guidelines because the activities of the three aforementioned employees in respondent's retention campaign did not constitute *partisan political*

*activity,* which is the only political activity proscribed.

The proscribed activity is set forth in Section 2 of the Guidelines as follows:

2. *Prohibition On Partisan Political Activity.* Court-appointed employees shall not be involved in any form of partisan political activity.

It is clear that, from its very expression, the term *"partisan* political activity" does not include *non-partisan* political activity. Moreover, the Supreme Court reiterates that distinction by declaring that the former term specifically excludes the latter when in Section 1 of the Guidelines the Court defines the activity prohibited by Section 2 as follows:

(a) The term 'partisan political activity' shall include [describing included activities] *but shall not include involvement in non-partisan ... organizations ...* (Emphasis added.)

Retention elections are non-partisan by their very nature as well as by constitutional edict, for Article V, § 15(b) of the Pennsylvania Constitution provides:

If a justice or judge files a declaration [of candidacy for retention election] his name shall be submitted to the electors *without party designation, on a separate judicial ballot or in a separate column on voting machines* ... to determine only if he shall be retained in office. (Emphasis added.)

When the concept of retention election was adopted by the delegates to the Constitutional Convention of 1967–68, the delegates did so in response to a widespread consensus upon the need to remove the judiciary from the partisan political process—at least, hopefully, after they were judges.[7] The electorate subsequently approved the concept and the Constitution was amended to make the retention election process the law of the Commonwealth.[8]

---

7. See, for example, Delegate William Warren Scranton (Lackawanna): "I think the intention of this Convention should be, and their objective should be, to take the judiciary out of politics all up and down the line." Debates of the Constitutional Convention 1967–1968, Vol. II, p. 1032. See also, Address by Judge Burton R. Laub, former Common Pleas Judge of Erie County, then Dean of Dickinson Law School, *Id.* at pp.

47–48 and Reference Manual No. 5, *The Judiciary,* prepared for the Delegates to the Constitutional Convention of Pennsylvania by the Preparatory Committee, § 5.6.1.

8. It merits mention that the retention election process does not extend to district justices. The program of Governor Scranton—to take the judiciary out of politics "all up and down the line",

Since the activity of the court-appointed employees in respondent's retention election effort was not the proscribed partisan political activity, we conclude that the charges of Counts 9 through 16 have not been established.[9]

### 3. *PART C*

In Part C of the Complaint the Board charges that the "Committee to Retain Richard D. Cicchetti as President Judge" filed two Campaign Expense Reports, one on November 22, 1993 and one on January 13, 1994, both of which contained false information in violation of the Election Code and that respondent executed affidavits upon both reports attesting that the Committee had not violated any provision of the Election Code when, in fact, he knew those statements were false. As noted earlier, we find that the Board has established this charge by clear and convincing evidence.

The Board charges that the execution by respondent of these two false affidavits subjects him to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution because that conduct constitutes:

1. misconduct in office (Count 17),

2. such that prejudices the proper administration of justice (Count 18),

3. such that brings the judicial office into disrepute (Count 19),

4. a violation of Canon 1 of the Code of Judicial Conduct (Count 20),

5. a violation of Canon 2 of the Code of Judicial Conduct (Count 21),

6. a violation of Article V, § 17(b) of the Pennsylvania Constitution because it is a violation of Canons 1 and 2 (Count 22),

7. a violation of Article V, § 17(b) of the Pennsylvania Constitution because it is a violation of the Crimes Code of Pennsylvania (18 Pa.C.S.A. § 4902 and § 4903) (Count 23),

8. a violation of Article V, § 17(b) of the Pennsylvania Constitution because it is a violation of the Election Code (25 Pa.C.S.A. § 3249) (Count 24),

9. a violation of Rules 8.4(b), (c), (d) and (e) of the Pennsylvania Rules of Professional Conduct (Count 25).

We will address these nine Counts in the order in which the Board has recited the Counts.

*Count 17.* Misconduct in office.

Based on our definition of the offense, set out earlier in our discussion of Count 1, we find that respondent's execution of the affidavits upon the Campaign Expense Reports was not misconduct in office inasmuch as the execution of these reports was not done in the course of his official judicial duties.

*Count 18.* Conduct which prejudices the proper administration of justice.

We refer to our earlier discussion of this canonical proscription in connection with Count 2 and for the reasons there expressed, find that the execution of the affidavits upon the Campaign Expense Reports did not prejudice the administration of justice.

---

*see* footnote 7, *supra*—would seem, therefore, to have fallen somewhat short of this goal at the Constitutional Convention. The disparity seems, as well, somewhat anomalous since the duties of a district justice bring the holder of that office into closer and more frequent contact with the electorate than a judge of the common pleas or appellate courts. Thus, it might well serve the citizenry of the Commonwealth were the legislature to visit this dissimilarity.

9. We are aware that the Supreme Court has held that a court-appointed employee who was nominated by both the Democratic and Republican parties was subject to the proscription against partisan political activities which was in effect at that time. See, *In re Prohibition of Political Activities*, 473 Pa. 554, 375 A.2d 1257 (1977).

We easily distinguish that case because there the candidate was the candidate of two political parties whereas the constitution specifically requires that the retention candidate's name be submitted to the electors "without party designation." Moreover, nomination by the Democratic and Republican parties does not preclude competition from other parties or other candidates. In a retention election there is simply no competition (except such as the candidate's record might provide.) Finally, in 1987, the Supreme Court issued the Guidelines which were "intended to clarify" its previously existing policy, and the Guidelines, which control here, specifically exclude "involvement in non-partisan ... organizations."

*Count 19.* Conduct which brings the judicial office into disrepute.

We refer to our earlier discussion of this constitutional proscription in connection with Count 3 and, for the reasons there expressed, we find that the execution of the affidavits upon the two Campaign Expense Reports did not amount to conduct which was "so extreme" as to bring the judicial office into disrepute.[10]

*Counts 20, 21 and 22.* Violation of Canons 1 and 2 and violation of Article V, § 17(b).

 Based on the interpretation of Canons 1 and 2 set forth earlier in connection with our discussion of Counts 4 and 5, we find that the execution of the affidavits upon the two Campaign Expense Reports does not constitute conduct proscribed by those Canons and thus is not a derivative violation of Article V, § 17(b) of the Pennsylvania Constitution.

*Count 23:* Conduct prohibited by law, *viz.,* perjury and false swearing under the Crimes Code, 18 Pa.C.S.A. §§ 4902, 4903 in violation of Article V, § 17(b) of the Constitution.

 In this Count the Board has charged respondent with violating Article V, § 17(b) of the Constitution by virtue of an alleged violation of the perjury and false swearing sections of the Crimes Code of Pennsylvania.

In Count 24, the Board has charged that the same conduct, i.e., signing the affidavits attesting that to be true which he knew to be false, also constitutes a violation of Article V, § 17(b) of the Constitution because that conduct constituted a violation of 25 Pa.C.S.A. § 3249 of the Pennsylvania Election Code.

In *Commonwealth v. Bidner,* 282 Pa.Super. 100, 422 A.2d 847 (1980), the Superior Court was confronted with a situation almost identical to the instant case. The defendant there was charged both with perjury under Section 4902 of the Crimes Code and with making a false statement under oath in violation of Section 3502 of the Election Code.[11]

The Superior Court in that case affirmed the dismissal by the trial court of the perjury charge under Section 4902 of the Crimes Code. In doing so, the Court observed that

... § 4902 is a general penal provision encompassing all wilfully false statements in any official proceeding. Section 3502, on the other hand, is a more specific measure applying only to persons who violate its strictures in the exercise of their franchise privileges.

422 A.2d at 850.

The Court then looked to The Statutory Construction Act of 1972, 1 Pa.C.S.A. § 1933 which provides:

Whenever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions is irreconcilable, the special provisions shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest intention of the General Assembly that such general provision shall prevail.

*Id.* Finding no manifest intention that § 4902 of the Crimes Code should prevail over § 3502 of the Election Code, the Court noted that:

Indeed, it has been observed that "this [Crimes] Code does not apply to or include offenses in other distinct areas of the law where an offense is defined and the penalty therefor is provided, such as the Vehicle Code, Liquor Code, etc." Toll, Pa.Crimes Code Annotated, p. 25 (1974). Since the Election Code establishes its own comprehensive scheme of offenses and penalties, 25 P.S. §§ 3501–3533, it would seem that the legislature intended to accord special treatment to this area of criminal conduct to the exclusion of more general provisions of the Crimes Code.

---

10. We note, in this regard, that there is no evidence—nor even suggestion—that the $2600 here involved was used for any improper or unlawful purpose.

11. Section 3502 provides the punishment for false statements under oath made in violation of provisions of the Election Code such as section 3249.

*Id.* The Court there reiterated a well established principle as it affirmed the dismissal of the charge of perjury under the Crimes Code:

It is, in fact, the policy of the law not to permit prosecutions under the general provisions of a penal code when there are applicable special provisions available.

422 A.2d at 851. See also *Commonwealth v. Brown*, 346 Pa. 192, 29 A.2d 793 (1943); *Commonwealth v. Buzak*, 197 Pa.Super. 514, 179 A.2d 248 (1962); *Commonwealth v. Litman*, 187 Pa.Super. 537, 144 A.2d 592 (1958).

 It is certain, then, that any attempt to prosecute this respondent for perjury under the Crimes Code would be dismissed just as that charge in *Bidner* was dismissed. Thus, we hold that, even though the activity of a judicial officer may fit the description of activity prohibited by a penal statute, if the judicial officer cannot be prosecuted under that general penal provision, he should not be exposed to discipline under Article V, § 17(b) of our Constitution, when violations of that Article are entirely derivative of and dependent upon violations of the other law. We have little difficulty coming to this conclusion in this case (or in any *Bidner*-type case) because the very reason why prosecution cannot proceed under the general Crimes Code is the fact that the conduct is specifically proscribed by a distinct provision of another statute of discrete and narrow focus.

*Count 24.* Conduct prohibited by law, *viz.*, making a wilfully false, fraudulent or misleading statement in a report under oath required by the Election Code, 25 P.S. § 3249, in violation of Article V, § 17(b) of the Constitution.

 The evidence in this record—and it is abundantly clear and convincing—establishes that in his retention election of 1993 [12] respondent executed affidavits upon two Campaign Expense Reports attesting that the Committee had not violated any provision of the Election Code when he knew it had because he knew the reports contained false information.

The report filed November 22, 1993 represented that Roberta Meese, Jamie Gammon and Ann Raymond had been paid $1500 to reimburse them for the purchase of "Party Supplies". This was false and respondent knew it. He knew it because Roberta Meese delivered the cash to him, so he knew (a) that she, nor Gammon, nor Raymond, had not purchased party supplies with the $1500, and (b) that they had received no money from the Committee.

The record is not so compelling with respect to the two checks made payable to McDowell for he doesn't remember what he did with the money. However, it is established that he endorsed the checks. The evidence is clear and convincing that the representations on the report of November 22, 1993 that McDowell (a) had purchased "Party Supplies" and (b) had been reimbursed $600 for that expenditure were false. Likewise, the evidence is clear and convincing that the representations in the report of January 13, 1994 that McDowell (a) had expended $540 for "Transportation" and (b) had been reimbursed for that expenditure were false. Finally, we believe the evidence is clear and convincing that respondent knew that these representations were false because he knew that McDowell did not purchase any party supplies, did not furnish any transportation, and did not receive any money from the Committee.

Consequently, we find that respondent engaged in activity prohibited by law, *viz.*, § 3249 of the Election Code and thus has violated Article V, § 17(b) of the Pennsylvania Constitution.

*Count 25.* Conduct in violation of Sections 8.4(b) through 8.4(e) of the Pennsylvania Rules of Professional Conduct.

We proceed to summary dismissal of this charge on its face, because (1) Pa.R.P.C. 8.4 applies, by its very terms, only to lawyers and not to judges; and (2) we are confident that the conduct proscribed in Pa.R.P.C. 8.4 is the subject of the canons of ethics governing judges—the Code of Judicial Conduct—

12. The Election Code provisions relating to reporting campaign expenses *do* apply to retention elections. 25 P.S. § 3241(c).

as well as of the provisions of the Pennsylvania Constitution which govern the judiciary.

We pause, however, to address the argument that Pa.R.P.C. 8.4 is applicable to judges by virtue of the application of Pa. Const. Article V, Section 17(b), which states that "[j]ustices and judges shall not engage in any activity prohibited by law and shall not violate any canon of *legal or* judicial ethics prescribed by the Supreme Court." (Emphasis added). Though facially appealing, we reject the argument that the intent of this provision is to subject judges to the Rules of Professional Conduct, because of the absurd consequences that would ensue. Pa. R.P.C. 3.5, for example, provides that "a lawyer shall not seek to influence a judge." Application of this rule to judges would, of course, put appellate courts throughout the Commonwealth out of business. Rather, we interpret the language of Section 17(b) to permit the Board to investigate charges of misconduct against a judicial officer which took place while he or she was a lawyer prior to his or her elevation to the bench. *See, e.g., In re Greenberg*, 442 Pa. 411, 280 A.2d 370 (1971). We conclude, therefore, that a judicial officer may be charged with a violation of the Pennsylvania Rules of Professional Conduct only as it relates to conduct of an individual at a time when that individual was not a member of the bench.

## IV. CONCLUSIONS OF LAW

### PART A

1. The Board's allegations relating to the conduct of respondent towards Debra Hay and Mary Beth Hostert should not be considered because to do so would violate principles of fundamental fairness and due process and would violate Rule 15 of the Rules of the Judicial Conduct Board.

2. The Board has not established by clear and convincing evidence the allegations of the conduct of respondent towards Krista Miller.

3. The Board has established by clear and convincing evidence the allegations of the conduct of respondent towards Heather Brueggman.

4. The conduct of respondent towards Heather Brueggman does constitute conduct which brings the judicial office into disrepute.

5. The conduct of respondent towards Heather Brueggman was not performed in the course of official action nor in the course of adjudicative responsibilities.

6. The conduct of respondent toward Heather Brueggman was not intended to obstruct or prejudice judicial proceedings and did not obstruct or prejudice judicial proceedings.

7. The conduct of respondent towards Heather Brueggman does not constitute:

(a) misconduct in office;

(b) conduct which prejudices the proper administration of justice;

(c) a violation of Canon 1 of the Code of Judicial Conduct;

(d) a violation of Canon 2 of the Code of Judicial Conduct;

(e) a violation of Canons 3A(3) or (4) of the Code of Judicial Conduct;

(f) a violation of Article V, § 17(b) of the Pennsylvania Constitution.

### PART B

8. The Order of the Supreme Court of Pennsylvania dated June 29, 1987, 82 Administrative Docket No. 1, and the Guidelines promulgated thereunder, is a "rule prescribed by the Supreme Court" under Article V, § 18(d)(1).

9. In 1993 Pandalyn Forrest, Roberta Meese and James McDowell were "court-appointed employees" under the Supreme Court Guidelines when they assisted respondent in his campaign effort for retention as judge.

10. The activity of rendering assistance to a judge in a retention election is not "partisan political activity".

11. The only activity prohibited by the Supreme Court Guidelines is "partisan political activity".

12. The respondent had no duty as President Judge to prohibit Forrest, Meese and McDowell from assisting in his campaign for

retention since the Supreme Court did not prohibit such assistance.

*PART C*

13. The execution by respondent of the false affidavits upon the two Campaign Expense Reports was not done in the course of official action.

14. The execution by respondent of the false affidavits upon the two Campaign Expense Reports was not done with intent to obstruct or prejudice judicial proceedings and did not obstruct or prejudice judicial proceedings.

15. The execution by respondent of the false affidavits upon the two Campaign Expense Reports does not constitute:

 (a) misconduct in office;

 (b) conduct which prejudices the administration of justice;

 (c) conduct which brings the judicial office into disrepute;

 (d) a violation of Canon 1 of the Code of Judicial Conduct;

 (e) a violation of Canon 2 of the Code of Judicial Conduct;

 (f) a violation of Article V, § 17(b) of the Pennsylvania Constitution because of a violation of Section 4902 and 4903 of the Crimes Code inasmuch as respondent cannot be prosecuted under those Sections of the Crimes Code because the same conduct has at the same time been charged as a violation of another, more specific statute, *viz.*, the Election Code.

16. The execution by respondent of the affidavits upon the two Campaign Expense Reports attesting that, to the best of his knowledge and belief, the Committee had not violated any provision of the Election Code was a wilfully false, fraudulent or misleading statement in violation of section 1629 of the Election Code, 25 P.S. § 3249.

17. The execution by respondent of the false affidavits upon the two Campaign Expense Reports was a violation of Article V, § 17(b) of the Pennsylvania Constitution because that conduct is prohibited by law, *viz.*, Section 1629 of the Election Code, 25 Pa. § 3249.

18. The conduct of respondent did not constitute a violation of the Pennsylvania Rules of Professional Conduct because those Rules do not apply to the conduct of judges while they are judges since the conduct of a judge is specifically governed by the Code of Judicial Conduct and by the Constitution.

19. The respondent is subject to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution.

MAGARO, J., files a concurring and dissenting statement in which SWEENEY. J., joins.

MAGARO, Judge, concurring and dissenting.

I join in the opinion of the Court in all respects except for that portion expressed in PART B.

In PART B the Court holds that the Order of the Supreme Court, 82 Judicial Administration Docket No. 1, dated June 29, 1987 and the Guidelines promulgated thereunder, prohibiting partisan political activities by court-appointed employees, does not apply to retention elections. I respectfully dissent because I do not believe the Supreme Court intended to make such a distinction.

I recognize, as the majority points out, that (a) the activity proscribed by the Guidelines is limited to "partisan, political activity" and (b) the Constitutional Amendment establishing the retention election process provides for the submission of the candidate's name to the electors "without party designation". Nevertheless, there is no doubt that a retention election can be a partisan political affair.

Initially, it should be pointed out that this Court's exemption of political activity by court-appointed employees in retention elections would extend not only to those who would aid in the effort to retain the candidate, but also to those who would aid in an effort to achieve his or her ouster.

The reality is, at least in this Commonwealth, that judges are members of one or another political party. They are no less so when they stand for retention. The constitutional scheme for retention elections permits

opposition to a candidate; permits the electors to vote "No"—not just because the candidate's performance in office may be perceived to have been substandard, but for any reason, including the identity of the candidate's political party. Thus, the reality is that any opposition to a candidate for retention—certainly any organized opposition—is most likely to come from the opposing political party. In such a case, what would follow would be partisan political campaigns conducted in a partisan political election. In such a case, if retention elections are exempt from application of the Order and Guidelines of the Supreme Court, as this Court concludes, court-appointed employees would be free to engage in any or all of the activities [1] which the Supreme Court has forbidden.

I believe this to be the reality of the retention election process in the Commonwealth—whatever might have been the intentions or hopes of the delegates at the Constitutional Convention in 1967–68. Moreover, I believe the Supreme Court recognized this to be the case and thus did not intend to exclude retention elections from the operation of its ban on the activities of court-appointed employees contained in its 1987 Order and Guidelines. To believe otherwise, indeed to hold otherwise, requires a finding that the Supreme Court, having announced a broad policy prohibiting partisan political activity by court-appointed employees, intended to create an exception to that policy for retention elections, and, thus, intended to treat those elections differently from all other judicial elections. I believe any such intention should be found not by inference or implication, but only if it is expressed by specific language. There is no such language in the Order of the Supreme Court of June 29, 1987 nor in the Guidelines promulgated thereunder.

In fact, the comments of the Supreme Court on the purpose of earlier memoranda on this subject [2] indicate an intention that the policy be broadly applied and militate against a finding of an intention to create an exception for retention elections. In *In re Prohibition of Political Activities*, 473 Pa. 554, 375 A.2d 1257 (1977), the Supreme Court stated 375 A.2d at page 1259:

> The purpose of the memoranda, of course, was to maintain not only the independence, integrity and impartiality of the judicial system but also the appearance of these qualities. The vice of mixing political and judicial activity is too obvious to require elaboration herein. Only by a steadfast separation of partisan political activity from the judicial function can the confidence of the public in courts and judges be merited and maintained.

In my opinion, if court-appointed employees are permitted to work in judicial retention elections, the confidence of the public in courts and judges will be diminished, rather than "merited and maintained."

Consequently, I dissent from PART B of the Discussion of this Court's Opinion as well as from Conclusions of Law Nos. 10 and 12.

Judge SWEENEY joins in this Concurring and Dissenting Statement.

---

1. "... working at a polling place on Election Day, performing volunteer work in a political campaign, soliciting contributions for political campaigns, and soliciting contributions from a political action committee or organization." Guidelines Regarding Political Activity B Court-Appointed Employees 1(a).

2. Memoranda were issued in 1976 and 1977 by the Court Administrator of Pennsylvania prohibiting political activity by court-appointed employees.