IN RE: Kelly S. BALLENTINE, Magisterial District Judge, District Court 02–2–01, Second Judicial District, Lancaster County

No. 7 JD 13

Court of Judicial Discipline of Pennsylvania.

April 16, 2013
Order June 10, 2013

Hon. Robert A. Graci, Chief Counsel, Elizabeth A. Flaherty, Assistant Counsel, Heidi F. Eakin, Esquire, Lemoyne, PA, for Respondent

BEFORE: BERNARD L. MCGINLEY, P.J., CHARLES A. CLEMENT, JR., JOHN R. CELLUCCI, TIMOTHY F. MCCUNE, ROBERT J. COLVILLE, CARMELLA MULLEN, JJ.

## ORDER

PER CURIAM

AND NOW, this 16th day of April, 2013, based upon the Opinion filed herewith, it is hereby ORDERED:

That, pursuant to C.J.D.R.P. No. 503, the attached Opinion with Findings of Fact and Conclusions of Law be and it is hereby filed, and shall be served upon the Judicial Conduct Board and upon the Respondent;

That, either party may elect to file written objections to the conclusions of the Court, stating therein the basis for those objections, provided that such objections shall be filed with the Court within ten (10) days of the date of the entry of this Order, and a copy thereof served upon the opposing party;

That, in the event such objections are filed, the Court shall determine whether to entertain oral argument upon the ob-

jections, and issue an Order setting a date for such oral argument;

That, in the event objections are not filed, within the time set forth above, the Findings of Fact and Conclusions of Law shall become final, and this Court will issue an Order setting a date, pursuant to C.J.D.R.P. No. 504, for a hearing on the issue of sanctions.

## OPINION BY JUDGE CLEMENT

### I. *INTRODUCTION*

The Judicial Conduct Board ("Board") filed a Complaint with this Court on February 22, 2013 against Magisterial District Judge Kelly S. Ballentine ("Respondent"). The Complaint charges that Respondent dismissed three traffic citations (two parking tickets and one for out-of-date motor vehicle registration) which had been issued to her. These dismissals were entered by Respondent in the Magisterial District Judge Computer System on December 29, 2010 and on January 27, 2011. The Board charges that, on February 1, 2013, Respondent entered a plea of guilty to three counts of Tampering with Public Records or Information, a misdemeanor of the second degree under 18 Pa.C.S.A. § 4911(a)(3).

In its Complaint the Board has charged that Respondent's conduct set out in the Complaint not only constitutes misdemeanors but also subjects her to discipline under Article V, Section 18(d)(1) of the Pennsylvania Constitution for the following reasons:

1. the Respondent's conduct violated Rule 2A, of the Rules Governing Standards of Conduct of Magisterial District Judges (Count 1),

2. the Respondent's conduct violated Rule 13A.[1] of the Rules Governing Standards of Conduct of Magisterial District Judges (Count 2),

3. the Respondent's conduct violated Article V, § 18(d)(1) of the Pennsylvania Constitution because the conduct is such that brings the judicial office into disrepute (Count 3),

4. the Respondent's conduct violated Article V, § 18(d)(1) of the Pennsylvania Constitution because the conduct is such that prejudices the proper administration of justice (Count 4),

5. the Respondent has violated Article V, § 17(b) because her conduct was a violation of Rules 2A. and 13A.[2] of the Rules Governing Standards of Conduct of Magisterial District Judges (Count 5).

The parties have submitted stipulations of fact in lieu of trial under C.J.D.R.P. No. 502(D)(1). The Court has accepted the stipulations of fact in pertinent part, recited below, as the facts necessary for the disposition of this case.

### II. *FINDINGS OF FACT*

1. Pursuant to Article V, § 18 of the Constitution of the Commonwealth of Pennsylvania, the Board is granted authority to determine whether there is probable cause to file formal charges, and, when it concludes that probable cause exists, to file formal charges against a justice, judge or magisterial district judge for proscribed conduct and to present the case in support of such charges before the Court of Judicial Discipline.

2. On January 2, 2006, Judge Ballentine began her service as the duly-elected Magisterial District Judge for Magisterial District 02–2–01 of the Second Judicial

---

**1.** There is no Rule 13A. There is a Rule 13 which is the Rule to which the Board refers in this charge.

**2.** *See,* n. 1, *supra.*

District, Lancaster County, Pennsylvania, encompassing the City of Lancaster—Wards 3 and 7.

3. On February 13, 2012, by Police Criminal Complaint filed at *Commonwealth v. Kelly S. Ballentine*, CR–0000021–12, the Pennsylvania Office of Attorney General charged Judge Ballentine with the following offenses:

Conflict of Interest (F) (3 counts), 65 Pa.C.S.A. § 1103.

Tampering with Public Records or Information (F3) (3 counts), 18 Pa.C.S.A. 4911(a)(1).

Tampering with Public Records or Information (F3) (3 counts), 18 Pa.C.S.A. § 4911(a)(3).

Obstructing Administration of Law or Other Governmental Function (M2) (3 counts), 18 Pa.C.S.A. § 5101.

A copy of the Police Criminal Complaint is attached as Exhibit A to the Board Complaint.

4. On February 13, 2012, the Board filed a Petition for Relief requesting interim suspension with pay. By Per Curiam Order dated February 22, 2012, the Court of Judicial Discipline directed that Judge Ballentine be suspended with pay from all of her judicial duties as magisterial district judge at *In re Ballentine*, 1 JD 12. It further directed that Judge Ballentine's entitlement to any medical benefits would not be affected.

5. On June 1, 2012, the Pennsylvania Office of Attorney General filed a criminal Information and charged Judge Ballentine with the following offenses:

Conflict of Interest (Counts 1, 2 & 3)

65 Pa.C.S.A. § 1103(a)(F–3) (amended to (F) October 10, 2012)

Tampering with Public Records or Information (Counts 4, 5 & 6)

18 Pa.C.S.A. § 4911(a)(3)(F–3) (a combination of Counts 4, 5, 6, 7, 8 & 9 from the Police Criminal Complaint)

Obstructing Administration of Law or Other Governmental Function (Counts, 7, 8 & 9)

18 Pa.C.S.A. § 5101 (M–2)

A copy of the Information is attached as Exhibit B to the Board Complaint. Although only 18 Pa.C.S.A. § 4911(a)(3) appears in the titles of Counts 4, 5 and 6 of the Information, the language in each count also encompasses §§ 4911(a)(1) & (2).

6. On February 1, 2013, pursuant to a plea agreement, Judge Ballentine appeared with counsel, Royce L. Morris, Esq., before the Honorable Charles B. Smith, Senior Judge of the Chester County Court of Common Pleas, and entered a plea of guilty to three counts of an amended charge of Tampering with Public Records or Information, 18 Pa.C.S.A. § 4911(a)(1)-(3), misdemeanors of the second degree (Counts 4, 5 and 6 of the Criminal Complaint). As part of the plea agreement, the Commonwealth agreed to dismiss or nol pros the remaining charges (Counts 1, 2, 3, 7, 8 and 9) at the time of sentencing. On March 18, 2013, Respondent was sentenced to pay a fine of $500.00 on each of the three counts—a total of $1,500.00 in the Court of Common Pleas of Lancaster County.

7. In Pennsylvania, all magisterial district judges and their staffs utilize the Magisterial District Judge Computer System which is the case management and accounting system that generates all forms necessary to processing civil, criminal and traffic cases.

8. During the guilty plea hearing, Judge Ballentine admitted committing three misdemeanor offenses of Tampering with Public Records or Information through her conduct as follows: 1. On

December 29, 2010, she entered the Magisterial District Judge Computer System and dismissed two traffic citations issued to her on November 1, 2010. Judge Ballentine wrote the date, the word "dismissed" and her initials on each citation (Counts 4 and 5 of the Criminal Complaint); 2. On January 27, 2011, Judge Ballentine entered the Magisterial District Judge System and dismissed a third traffic citation issued to her on November 8, 2010 (Count 6 of the Criminal Complaint). Judge Ballentine admitted to engaging in this intentional conduct of entering the Magisterial District Judge Computer System and dismissing traffic citations issued to her and claimed that she had no intent to defraud. The lack of an intent to defraud distinguishes misdemeanor counts of Tampering with Public Records or Information from felony counts of Tampering with Public Records or Information under 18 Pa.C.S.A. § 4911(b).

9. The statutory language utilized during the guilty plea hearing mirrors that of 18 Pa.C.S.A. § 4911(a)(1).

> MR. FORRAY: The charge of, again, tampering with public records or information indicates that, with the intent to defraud, you did knowingly make false entry or false alteration of any record, document, or thing belonging to or received by or kept by the government for information or record.

(Guilty plea Hr'g Tr. 9:9–14, Feb. 1, 2013.)

Following input from defense counsel, Attorney Anthony Forray acknowledged that he erred when he included the phrase "with the intent to defraud" within the colloquy and corrected his mistake for the record. (*Id.* at 9:24–10:8.)

With the modification in language, the guilty plea concluded.

> MR. FORRAY: So based on what I have indicated, striking the intent to defraud, how do you plead to those charges?
>
> THE DEFENDANT: Guilty.

(*Id.* at 10:18–21). A copy of the Guilty Plea transcript is attached as Exhibit C to the Board Complaint.

### III. *Discussion*

We will address the Board's charges in the order in which they are set out in the Complaint as well as in the Introduction to this opinion.

*Count 1.*

■ Count 1 charges Respondent with violation of Rule 2A. of the Rules Governing Standards of Conduct of Magisterial District Judges. The Rule provides:

RULE 2. IMPROPRIETY AND APPEARANCE OF IMPROPRIETY TO BE AVOIDED.

A. Magisterial district judges shall respect and comply with the law and shall conduct themselves at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. Magisterial district judges shall not allow their family, social or other relationships to influence their judicial conduct or judgment. They shall not lend the prestige of their office to advance the private interest of others, nor shall they convey or permit others to convey the impression that they are in a special position to influence the judge.

Even the most incurious glance at the rule will quickly reveal that its language is vague and imprecise—conspicuously so: words and phrases such as "impropriety," "appearance of impropriety," "confidence in the integrity" unmistakably invite—nay, require—subjective interpretation. This is undesirable because subjective interpretations invariably vary one from another, and this is at variance with the mission of

this Court—or, at least, with the aspiration of this Court—which is to provide the judges of this Commonwealth with consistent holdings so they will know what conduct does—and what conduct does not—constitute a violation of any of the rules of conduct, including Rule 2A.

This Court first encountered this difficulty with Canon 2 (and Rule 2A.) [3] in the case of *In re Cicchetti*, 697 A.2d 297 (Pa. Ct.Jud.Disc.1997) where the Board averred that a judicial officer had sexually harassed a courthouse employee and charged that such conduct was a violation of Canon 2. In that case this Court observed that Canon 2:

> [is] directed at conduct which would impugn or detract from the ... "integrity and impartiality" of the judiciary.

*In re Cicchetti, supra* at 313. We then held that:

> "Integrity" must be read *in pari materia* with ... "impartiality" in Canon 2. Both of those words ... exhort judges to carefully preserve all appearance of even-handedness, of not favoring or appearing to favor either side in a case, of being and appearing free from influence. Consistently with this notion, "integrity" is defined as follows:
>
> 1: An unimpaired condition: SOUNDNESS
>
> 2: firm adherence to a code of esp. moral or artistic values: INCORRUPTIBILITY
>
> 3: the quality or state of being complete or undivided: COMPLETENESS *syn*, see HONESTY

Webster's New Collegiate Dictionary, 1993.

*Id.* We then repeated what we had emphasized in *In re Smith*, 687 A.2d 1229, 1240 (Pa.Ct.Jud.Disc.1996):

> Canon 2 in general is directed towards conduct which could potentially cause the public or litigants to believe that a judge is not acting impartially.[4]

*In re Cicchetti, supra*, at 313. We then held that the conduct proscribed by Canon 2 did not include the Respondent's harassment of the female court employee.

On appeal the Supreme Court affirmed this holding and stated:

> Canon 2 similarly addresses the judicial decision-making process and seeks to avoid the appearance of influence over judicial activities. Appellee is not subject to censure for a violation of Canon 2 based on his conduct toward Ms. Brueggman because it was independent of his decision-making duties.

*In re Cicchetti*, 560 Pa. 183, 201, 743 A.2d 431, 441 (2000).

In a later case, *In re Harrington*, 877 A.2d 570 (Pa.Ct.Jud.Disc.2005), Harrington had placed phony parking tickets on the windshield of her car to avoid being ticketed for illegal parking; in doing so she failed to "comply with the law." This Court held this was a violation of Rule 2A. We did so even though Harrington's conduct was in no way connected to the "decision-making process." We did so because the Rule's requirement that judges "comply with the law" is susceptible of objective interpretation—it is easy to know what it means and it means the same to all. On

---

**3.** Canon 2 of the Code of Judicial Conduct and Rule 2A. of the Rules Governing Standards of Conduct of Magisterial District Judges are identical.

**4.** The instructions contained in Subsection B. of Canon 2 (and later in Rule 2A.): that "a judge should not allow his family, social or

other relationships to influence his judicial conduct or judgment" and that he should not "convey or knowingly permit others to convey the impression that they are in a special position to influence him," provide further support for this interpretation of Canon 2.

the other hand, the requirement that judges "conduct themselves at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary" is vague and imprecise—it is not easy to know what it means and, as pointed out *supra*, it requires subjective interpretation and leads inevitably to inconsistent holdings—something to be avoided in jurisprudence. This, then, was the occasion for this Court's and the Supreme Court's limiting the application of the vague language of 2A. to the "decision-making process," a phrase coined by the Supreme Court in *Cicchetti*. Such limitation, we believe, nicely cures the difficulties thrown up by the imprecision of that language.

However, such limitation, we believe, is not necessary with respect to the requirement that judges "comply with the law" and, we believe that fastening that limitation to that requirement is likely at variance with the intention of the justices who drafted the Rule. Nevertheless, in the Supreme Court's Order affirming our decision in *Harrington*[5] it is stated that, even though Harrington's conduct did not "comply with the law," the Court "disapproved" our holding that Harrington had violated Rule 2A. because her conduct did not occur in the "decision-making process."[6]

In this case, however, the Respondent's conduct did occur in the decision-making process: the conduct in question—the dismissing of the citations—was the actual making of the decision. Thus, we hold that Respondent violated Rule 2A. of the

Rules Governing Standards of Conduct of Magisterial District Judges.

*Count 2.*

■ Count 2 charges Respondent with a violation of Rule 13A.[7] of the Rules Governing Standards of Conduct of Magisterial District Judges. That Rule provides in pertinent part:

> Magisterial district judges ... and all employees assigned to or appointed by magisterial district judges shall not engage, directly or indirectly, in any activity or act incompatible with the expeditious, proper and impartial discharge of their duties, including, but not limited to, (1) in any activity prohibited by law...."

Respondent has been charged with, pleaded guilty to, and stipulated that she engaged in activity prohibited by law, see, Findings of Fact Nos. 5–9, thus violation of Rule 13 has been established.

*Count 3. and Count 4.*

■ These Counts charge Respondent with violation of Article V, § 18(d)(1) of the Pennsylvania Constitution for engaging in conduct which brings the judicial office into disrepute (Count 3) and which prejudices the proper administration of justice (Count 4). Here Respondent dismissed criminal charges filed against her. We cannot think of a purer example of conduct which prejudices the proper administration of justice; nor is there any doubt that this conduct, involving, as it does, the very

---

**5.** The Supreme Court affirmed our finding that Harrington's conduct was such that brings the judicial office into disrepute in violation of Article V, § 18(d)(1) of the Pennsylvania Constitution, and supported our imposition of sanctions.

**6.** This Court has, of course, heeded that disapproval (even though it is *dicta*) and, in all cases after *Harrington*, has required that the Board establish that the conduct in question

took place in the "decision making process" in all cases charging a violation of Canon 2 or Rule 2A for failing to "comply with the law," and will continue to do so unless the Supreme Court itself decides not to as so in the case *In re Carney*, 28 A.3d 253 (Pa.Ct.Jud.Disc.2011), presently pending on appeal in the Supreme Court.

**7.** *See*, n. 1, *supra*.

heart of the judicial function, is so extreme as to be such that brings the judicial office itself into disrepute. *See, e.g., In re Cicchetti,* 697 A.2d 297 (Pa.Ct.Jud.Disc.1997). We so find.

*Count 5.*

■ The Board has also charged that Respondent has, by virtue of her violation of Rules 2A. and 13A.[8] of the Rules Governing Standards of Conduct of Magisterial District Judges, violated Article V, § 17(b) of the Pennsylvania Constitution.

Section 17(b) of Article V of the Pennsylvania Constitution provides in pertinent part:

> Justices and judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court. Justices of the peace shall be governed by rules or canons which shall be prescribed by the Supreme Court.

■ We say and hold here, as we first said and held in *In re Joyce and Terrick,* 712 A.2d 834 (Pa.Ct.Jud.Disc.1998):

> In the section [17(b)], justices of the peace (now known as District Justices) are treated separately from justices and judges, for a reason no more complicated than that justices of the peace are governed by a separate and different Code of Conduct than the Code of Judicial Conduct which applies to justices and judges.
>
> We make two conclusions regarding the application of Article V, § 17(b) of the Constitution:
>
> 1. Violation of a canon of legal or judicial ethics by a justice or judge is a violation of § 17(b) of the Constitution. Section 17(b) by its terms makes a violation of a canon a violation of § 17(b).

Violation of the latter is thus derivative and automatic.

2. Though the sentence referring to justices of the peace says they "shall be governed by [The Rules Governing Standards of Conduct for District Justices]" but does not specifically say "shall not violate [those Rules]," in the context of § 17(b) the phrases mean the same, and the inclusion of the second sentence was intended to make a violation of the District Justices' Code a violation of the Constitution just as a violation of the Judicial Code is made a violation of the Constitution by the first sentence. Otherwise, there was no purpose in including the second sentence and its injunction would have no meaning or application—a violation of elementary principles of statutory interpretation. *See,*1 Pa.C.S. § 1921, *Habecker v. Nationwide Ins. Co.,* 299 Pa.Super. 463, 445 A.2d 1222 (1982) and cases cited therein. Thus, a violation of the Rules Governing Standards of Conduct for District Justices is an automatic, derivative violation of § 17(b) of the Constitution.

*Id.* at 845–46.

## IV. *CONCLUSIONS OF LAW*

1. Respondent's conduct set out in Findings of Fact Nos. 1–9 is:

(a) a violation of Rule 2A. of the Rules Governing Standards of Conduct of Magisterial District Judges,

(b) a violation of Rule 13 of the Rules Governing Standards of Conduct of Magisterial District Judges,

(c) such that brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution,

---

8. See. n. 1, *supra.*

(d) such that prejudices the proper administration of justice, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution, and

(e) inasmuch as it has been found that Respondent's conduct constitutes a violation of Rules 2A. and 13 of the Rules Governing Standards of Conduct of Magisterial District Judges, it is an automatic, derivative violation of Article V, § 17(b) of the Pennsylvania Constitution.

## ORDER

PER CURIAM

AND NOW, this 10th day of June, 2013, after a hearing held on the question of sanctions on May 17, 2013, and after consideration of memoranda filed by the Judicial Conduct Board and the Respondent and exhibits presented by Respondent, it is hereby ORDERED that Respondent is suspended from her judicial office without pay until May 31, 2013, and thereafter she shall be placed on probation until December 31, 2014.

Probation shall be conditional upon Respondent's repayment of compensation paid to her by the Commonwealth during the period from February 11, 2013 to May 31, 2013 according to the following schedule:

$5,000.00 on or before July 1, 2013,

$1,296.93 on or before August 1, 2013,

$1,000.00 monthly thereafter on the first day of each month until August, 2014.

Said probation shall be subject to the supervision of this Court and shall be subject to the condition that Respondent report monthly to the Chief Counsel of the Judicial Conduct Board or his designee at the times prescribed by the Judicial Conduct Board, and the Judicial Conduct Board shall file a written report monthly with this Court advising that, to its knowledge, Respondent, has, or has not, been in compliance with the condition set out above and with the Rules Governing Standards of Conduct of Magisterial District Judges and the provisions of Article V of the Pennsylvania Constitution pertaining to the conduct of magisterial district judges.

■ The Court rejects the Board's recommendations contained in its Memorandum On Sanctions that this Court remove this Respondent from her judicial office and permanently bar her from judicial office in the future, as well as the recommendation that this Court should impose an additional sanction ordering Respondent to "reimburse the Commonwealth for the values of the compensation and benefits she received since she was suspended from performing all judicial duties," i.e., since February 22, 2012. The Board contends that we should remove her because the provisions of Article VI, § 7 of the Pennsylvania Constitution and Article V, § 18(d)(3) require that we do. We disagree for the following reasons.

As to Article VI, § 7.

This section of the Constitution provides in pertinent part:

All civil officers shall hold their offices on the condition that they behave themselves well while in office, and shall be removed on conviction of misbehavior in office or of any infamous crime.

It is clear that the removal is to be accomplished at the sentencing by the trial/sentencing judge.[1] This is undisputed[2] as the Supreme Court has so held on several occasions. See, e.g., the Court's opinion in

1. In fact there is no "conviction" until the judgment of sentence is imposed.

2. See Judicial Conduct Board Memorandum on Sanctions, p. 6.

*In re Braig,* 527 Pa. 248, 590 A.2d 284 (1991) where the Court held, quoting from its opinion in *Commonwealth ex rel. Woods v. Davis,* 299 Pa. 276, 149 A. 176 (1930) (dealing with Davis's contention that legislation was required in order to accomplish his removal from office after a conviction of misbehavior in office [3] under Article VI, § 7 [4]):

> We rejected this argument and, holding that the removal had been constitutionally imposed.... Observing that the framers of the Article [VI] had to have been aware of the many statutes which, "after defining the crime [any crime], say that the defendant 'on conviction' shall be fined and/or imprisoned, the penalty being imposed by the court before whom the defendant was convicted," we concluded that it must have been expected "that the constitutional provision providing for a specified punishment 'on conviction' [of misbehavior in office or infamous crime] would be interpreted in exactly the same way." 299 Pa. at 280–281, 149 A. 176.

**3.** Davis was charged, tried and convicted of "misbehavior in office."

**4.** Formerly Article VI, § 4 of the Constitution.

**5.** The legislature has also dealt with the removal of public officers. In Section 121 of Title 65, it provided:

> Any person, holding public office in this Commonwealth, who pleads nolo contendere or guilty, or is convicted in a court of record of extortion, embezzlement, bribery, *malfeasance or misfeasance in office,* or fraudulent conversion of public monies or property, or for any *misdemeanor in office,* shall forfeit his office, and the sentence *imposed by the court shall include* the direction for the removal from office of such person. (Emphasis added.)
>
> We believe that this statutory injunction, that removal shall be by the trial court, *ipso facto* and *ipso jure,* carries with it the concomitant injunction that no other court shall do it.

**6.** In addition to the above quotation, Justice Papadakos set out his belief

*In re Braig, supra,* at 253, 590 A.2d 287. *See, also, Braig v. State Employees Retirement Board,* 138 Pa. Commw. 124, 132, 587 A.2d 371, 375 (1991). We believe these holdings of the Supreme Court make removal by the trial judge under Article VI, § 7 (as well as under Article V, § 18(d)(3)) the exclusive province and responsibility of the trial/sentencing judge. As Justice Papadakos observed, concurring in *Braig*:

> When a jurist is convicted of "misbehavior in office" the sentencing judge *will impose* the automatic forfeiture provision *as part of the sentence which can then be reviewed as any other judgment of sentence.* (Emphasis added.)

*In re Braig, supra,* at 259, 590 A.2d 290.[5] We believe that intervention by this Court into a separate judicial process would be contrary to the intention of the drafters of the Constitution, antithetical to an orderly and logical jurisprudential process and at variance with the decisions of our Supreme Court.[6]

> ...that Article V, Section 18(1) is applicable where a jurist is charged specifically with the crime of "misbehavior in office."
> ... I am concerned that the majority has chosen to avoid speaking clearly on what crime must be charged in such cases and, in so doing, has failed to give direction to the bench and bar in the manner that these very important cases are to be commenced, prosecuted and disposed.
> *Id.* We believe that consideration might well be given to the Justice's idea that the constitutional call for removal for "conviction of misbehavior in office" (as in Article V, § 18(1)—now § 18(d)(3)) should be limited to cases where a jurist is charged specifically with the crime of "misbehavior in office." If that were the case, the jurisprudential exercise in these cases would be measurably simplified for,
> — if that were the case, everybody would know at the beginning of the criminal case—especially the lawyers and the charged jurists—that if a guilty plea is made, or if conviction happens, removal will surely follow, and

■ As to Article V, § 18(d)(3).

This section of the Constitution provides:

> (3) A justice, judge or justice of the peace convicted of misbehavior in office by a court, disbarred as a member of the bar of the Supreme Court or removed under this section shall forfeit automatically his judicial office and thereafter be ineligible for judicial office.

We note that when analyzing this language in *Braig*. the Supreme Court observed:

> In its Petition, the Board cited only the first of these, conviction for misbehavior in office, as the grounds for the relief requested. Our resolution of this case, however, requires that we distinguish between this condition precedent to forfeiture and the other condition specified, removal under Section 18. This latter form of removal, following formal charges, investigation by the Board, recommendation of discipline, and action by the Court, may be founded on a wide range of activity, described in subsection (d)—"violation of section 17 of [Article V], misconduct in office, neglect of duty, failure to perform duties, [and] conduct which prejudices the proper administration of justice or brings the judicial office into disrepute." If the Constitution provides "conviction for misbehavior in office" as a separate basis for forfeiture,

this must be something different from the forfeiture accompanying removal directed by the Court on the basis of the record developed before the Judicial Inquiry and Review Board.

*Id.* at 251–52, 590 A.2d 286.

The Court went on to say:

> Based on our reading of all the cases, we must conclude that the language of Article V, Section 18(1),[7] like the identical language of present Article VI, Section 7, refers to the offense of "misbehavior in office" as it was defined at common law. This conclusion is not without its difficulties, however. Since the enactment of the Crimes Code effective June 6, 1973, common law crimes have been abolished and "[n]o conduct constitutes a crime unless it is a crime under this title or another statute of this Commonwealth." 18 Pa.C.S. § 107(b). Thus no prosecution on a charge of "misbehavior in office" can now be undertaken. Rather than reach the difficult question whether the legislature could effectively nullify the constitutional provision by abolishing the crime referred to therein, we think it prudent to adopt a holding under which the constitutional provision may still be given effect. Therefore, we hold that the automatic forfeiture provision of Article V,

— if that were the case, everyone will know at the end of the criminal case—especially the lawyers and the charged jurists—whether the jurist pled to or was convicted of "misbehavior in office" or not (which was not the case in *Braig*, nor in this case), and

— if that were the case, there would be no messy situations (as in *Braig*, as here) where we find ourselves litigating (relitigating?) in a different court, at a later time (in *Braig*, 1 year and 5 months later, in this case 4 months later) the question of whether the charged jurist pled to or was convicted of "misbehavior in office," or not.

Nor, in order to accomplish this, is there any need to debate the merits (or unmerits) of

the respective positions held in 1990 of Justice Papadakos and the other Justices as to whether the Legislature could or could not eliminate the common law crime of misbehavior in office when it enacted the Crimes Code of 1973 (*see Braig, supra*, at 254, 590 A.2d 287, and n.7, *infra*). This can be accomplished by a simple legislative enactment creating a new crime called "misbehavior in office" and defining it as the old crime was defined.

7.   Section 18(1) contains the same language as current Section 18(d)(3).

Section 18(1) applies where a judge has been convicted of a crime that satisfies the elements of the common law offense of misbehavior in office.[8]

*Id.* at 254, 590 A.2d 287–88.

The Court then came to grips with the argument JIRB was making as follows:

Proceeding from the premise that misbehavior in office is established by a breach of a statutorily imposed duty, the Board argues that Braig has committed such a breach. The duty, they argue, is set out in Article V, Section 17(b), which provides that "Justices and judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court." ... Without depreciating the importance of Section 17(b), we do not agree that it constitutes the type of *positive* duty the breach of which constitutes misbehavior in office. As it is stated, it is a negative duty, a duty not to engage in certain conduct. By comparison, in all the cases where violation of a statutory duty was identified as the equivalent of misbehavior in office, the statute required that the officeholder perform a particular act or exercise a function of the office in a particular way. (Emphasis the Court's.)

*Id.* at 255–56, 590 A.2d 288.

Such a "negative duty" is evident in this case as well. A review of the definition of the offense of tampering with public records or information 18 P.S. § 4911 reveals that, like Section 17(b) of Article V, "it [does not] constitute the type of *positive* duty the breach of which constitutes misbehavior in office." (Emphasis the Court's.) That section provides:

§ 4911. Tampering with public records or information

(a) Offense defined.—A person commits an offense if he:

(1) knowingly makes a false entry in, or false alteration of, any record, document or thing belonging to, or received or kept by, the government for information or record, or required by law to be kept by others for information of the government;

(2) makes, presents or uses any record, document or thing knowing it to be false, and with intent that it be taken as a genuine part of information or records referred to in paragraph (1) of this subsection; or

(3) intentionally and unlawfully destroys, conceals, removes or otherwise impairs the verity or availability of any such record, document or thing.

As it is stated, as Section 17(b), it imposes "a negative duty, a duty *not* to engage in ... [the] conduct [described in § 4911]." (Emphasis the Court's.) As a consequence, as the Supreme Court held in *Braig*, it does not constitute misbehavior in office. Consonant with that decision, we so hold here.

In addition, we note that in *Braig*, the Supreme Court observed:

... that violation of Article V, Section 17 is specifically identified in Section 18(d) as one of the bases for proceedings before the Board [now the Court of Judicial Discipline] and discipline perhaps less than removal. We noted at the outset, however, that the constitution sets out conviction of misbehavior in office as a basis for forfeiture separate

---

office' and that it is still a viable, chargeable offense which could not be abrogated by the Legislature when it enacted the current Crimes Code." *In re Braig, supra,* at 259, 590 A.2d 290 (concurring opinion).

from removal under Section 18. It would thus be unreasonable to find that violation of Section 17 constituted the breach of positive duty underlying the offense of "misbehavior in office."

*Id.* at 256, 590 A.2d 288. It would be no less unreasonable to hold that a finding that conduct constitutes "misconduct in office"[9] under Section 18(d)(1), for which a reprimand could be determined to be the appropriate discipline, nevertheless required removal under Section 18(d)(3). It would be equally unreasonable to hold the conduct in question, though found not to amount to "misconduct in office" under Section 18(d)(1), nevertheless required removal under Section 18(d)(3).

■ This Court's conclusion that the suspension followed by probation herein ordered is the appropriate sanction in this case is based upon the following considerations:

1. Respondent reported, in a letter to Chief Counsel of the Judicial Conduct Board dated June 6, 2011 as follows:

Please be advised that it has come to my attention that action taken in the course of my judicial authority as Magisterial District Judge amounts to behavior that may have the appearance of impropriety and as such should be reported to the Judicial Conduct Board.[10] (Exhibit A).

2. In that letter Respondent goes on to relate to Chief Counsel how she came to receive the three tickets [11] and the circumstances leading to her dismissal of them.

Those circumstances are as follows:

Respondent has been a long time sufferer of Crohn's disease,[12] the most distressing and troublesome symptom of which is the emergency need to use the bathroom; the onset of this symptom is unpredictable and abrupt.

Respondent has stated in her "Sentencing Memorandum"[13] that she has been conducting one of the busiest magisterial districts in the Commonwealth [14]—with an under-size support staff. She testified that her district office has only one bathroom for the use of herself, her staff and all the people whom the vicissitudes of life bring to her office. (Sanction hearing, May 17, 2013, N.T. 67). This would include police, sheriffs, constables, bondsmen, landlords, tenants, all sorts of persons charged with all sorts of crimes,

---

9. "Misconduct in office" has been held to be the same as "misbehavior, misfeasance or misdemeanor in office." *Commonwealth v. Green,* 205 Pa.Super. 539, 546, 211 A.2d 5, 9 (1965).

10. This is an example of self-reporting which we rarely see, even though any judicial officer who does so is generally observing a high standard of conduct and acting so as to promote public confidence in the judiciary. (See Canons 1 and 2 of the Code of Judicial Conduct and Rules 1 and 2 of the Rules Governing Standards of Conduct of Magisterial District Judges.)

11. We note that all three of these tickets were issued for violation of local ordinances, not for violations of the Pennsylvania Motor Vehicle Code.

12. This is well documented in the medical records submitted by Respondent at the sanction hearing.

13. Sentencing Memorandum—this Court does not impose sentences.

14. We note that pages 1 and 2 of Exhibit B to Respondent's Memorandum, which are the two Summonses issued on the two tickets given on November 1, 2010 are Docket Nos. TR–0004578–2010 and TR–0004579–2010 which means that her court had processed 4,577 traffic cases before these in 2010. This certainly provides support for Respondent's representation that her's was a busy court.

traffic offenders, truants, witnesses, all nature of civil litigants and lawyers.

In these conditions it often happened that when Respondent had urgent need to access the restroom at the office, it was in use. In addition, Respondent didn't like to use the office restroom; it didn't score well in privacy, so she would take chances: "I would take the chance on making it to my home to take care of my emergency situations." (N.T. 67). On these occasions Respondent would get in her car, and drive to her home three blocks away and park at the first and only parking available. This was what happened on November 1 and November 8, 2010 when she got the three tickets at issue here. Respondent testified that she "was having medical issues stemming from Crohn's disease [and] on both occasions I had run home from my office which is three blocks away and opted for the first and only convenient parking available."[15] (Exhibit A, p. 2).

As part of Exhibit B, mentioned above, Respondent provided five pages of computer printouts from the City of Lancaster records of traffic tickets issued to Respondent between April 21, 2008 and September 5, 2012.[16] There is a total of 24 tickets for parking violations listed as issued to Respondent during that period. Nineteen of these tickets were for parking in front of her home (including the ticket for an expired registration). This ticket was placed on Respondent's car on November 1, 2010 along with the ticket for parking in a no parking zone. The other five tickets were for parking violations at other locations in the city during that period.

Respondent testified—and the city's records verify—that it was Respondent's practice to pay the fines. (Exhibit A, p. 1). However, she did not pay the fines for the two tickets issued November 1, 2010 or for the ticket issued November 8, 2010. Respondent did not testify why she did not pay those tickets; but the city's records (Exhibit B) establish that tickets become "past due" 15 days after issuance, and that the November 1 tickets became "past due" on November 16 and the November 8 ticket on November 23.[17]

As noted, Respondent, in Exhibit A, stated that she was having medical issues stemming from Crohn's disease during this time. The medical records verify this: Respondent was seen in some medical facility[18] on November 8, 2010 complaining of "lump on abdomen and buttock—noted yesterday—painful." The diagnosis was "Cyst, Sebaceous x2." She was given antibiotics and sent home. The records of the Lancaster Urgent Care Center establish that Respondent went to that facility on November 10, 2010 where two abscesses were "packed." That didn't work and so, on November 12, she went to Heart of Lancaster Hospital where emergency surgery was performed and the abscesses on the left upper quadrant and right buttocks were "opened up and packed." She was discharged on November 15. One week later, on November 22, 2010, Respondent

---

15. Insofar as the expired registration ticket is concerned, the police commonly give the vehicle owner ten days to get the vehicle inspected before issuing a ticket. In any event, Respondent had the car inspected with a current sticker in place by November 8 when she got another parking ticket which was not accompanied by an expired registration ticket.

16. The city did not have records older than those for 2008. (Exhibit A, p. 1).

17. Up until this date the fine is paid to the city, and after this date the "past due" cases are filed with the magisterial district judge in whose district the violation occurred.

18. This record does not include the name of the facility.

was seen by her surgeon, Dr. Paul G. Newman. The records include a letter from Dr. Newman to Dr. Peter A. Hurtubise (Respondent's primary physician) dated November 22, 2010 reporting on Respondent's visit on that date. In the letter, Dr. Newman reports on the surgery and Respondent's "several days in the hospital," as well as on his examination of Respondent on November 22, 2010. He reported that at that time the right buttock was essentially healed and that the one on the left upper quadrant was "granulating but still opened." She returned to Dr. Newman for her final post-surgery visit on December 10, 2010 when, although there was "some residual induration, there [was] no evidence of infection."

So there is no mystery as to why Respondent did not pay the tickets at issue here. She was otherwise occupied. She was in the hospital. She was in pain; she had surgery. She forgot about them. She forgot about them—probably until December 17, 2010 or shortly thereafter—which brings us to another subject.

The subject to which we refer is the Statute of Limitations contained in 42 Pa. C.S.A. § 5553 which is applicable here. That statute provides:

> § 5553. Summary offenses involving vehicles
>
> (a) General rule.—Except as provided in subsection (b) or (c),[19] proceedings for summary offenses under Title 75 (relating to vehicles) must be commenced within 30 days after the commission of the alleged offense or within 30 days after the discovery of the commission of the offense or the identity of the offender, whichever is later, and not thereafter.

Inspection of MDJ forms 617A "Summons for Summary Case Traffic" for the alleged offenses of November 1, 2010 are stated to have been printed on 12/21/2010. Those forms provide for the entry of the date the case was filed in the magisterial district court. On both forms for the November 1 tickets that date is stated to be "12/17/2010." (Exhibit B, pp. 1–2). That date is more than 30 days after November 1, 2010. it is also more than 30 days after the police knew Respondent was "the offender." She was, after all, the lady whom they had ticketed dozens of times for parking in a no parking zone in front of her home and she was, also, the African American judge who drove the BMW, and in whose courtroom they appeared, no doubt, on a regular basis. The corresponding Summons for the November 8, 2010 ticket is not part of this record but we can say two things about that case: 1. the Statute of Limitations for filing that case expired on December 8, which is 10 days *before* December 17, the date on which the November 1 case was filed, and 2, there is no evidence or any reason to think that the November 8 case was filed *before* the November 1 case; in which case the Statute of Limitations would bar the November 8 case as well. We think the evidence establishes that all three of these cases were filed after the Statute of Limitations had expired and, thus, were eminently dismissible.

This does not provide justification for Respondent's dismissal of her own cases. Nor do we believe that Respondent considered it as such—Respondent wasn't thinking about the Statute of Limitations here, we don't think she even realized it had expired. She testified about a police officer named George who is responsible for all the parking tickets in the City of Lancas-

---

19. The exceptions in subsections (b) and (c) have no application here.

ter with whom she has dealt over the years; and she said:

> But in my mind, because I've handled so many parking ticket cases and because I know the system and the way the city disposes of tickets, again, I apologize for it not throwing red flags up, but it's the way they would have been disposed of had I gone through the proper channels, had I sent it out to a different judge so that a different judge could hear my cases and have George there. The disposition would have been the same. (N.T. 69–70).

Even so, this is no justification for dismissing them herself and Respondent was quick to acknowledge that; she said:

> But I understand it's the process that was used to get us to that disposition that is the problem. So I'm well aware of my responsibility. I'm well aware that it was poor judgment in this particular situation. (N.T. 70).

We don't know all that was in Respondent's mind when she dismissed these citations on the computer but we know that one thing on her mind was dread of the publicity which would be attendant to any hearing if she had pled not guilty and sent the cases to another judge for trial. She was asked:

> PRESIDING JUDGE CLEMENT: Why didn't you plead not guilty and have a summary trial?
>
> Were you concerned that your Crohn's disease would become a public issue?
>
> MS. BALLENTINE: Absolutely.
>
> PRESIDING JUDGE CLEMENT: And was that part of your thought process by just discharging the citation?
>
> MS. BALLENTINE: It wasn't initially. When I was actually doing the disposition in the computer, that's not what I was thinking about.

> When I was talking to the officer who handles these situations, that definitely was my concern, because, of course, all of it's public knowledge when you go to have a hearing. And for a judge to have a not guilty hearing on a traffic citation in Lancaster County, that would have been of public interest.
>
> And, yes, so I thought—and, again, I wasn't ready to have my medical condition be part of the public knowledge. . . . (N.T. 74–75).

3. Respondent's cooperation in the Judicial Conduct Board at every stage of its investigation and prosecution of this case.

4. Respondent's evident contrition and remorse.

5. Respondent's excellent reputation in her community as attested by numerous (47) letters placed into this record from family members, neighbors, educators, including a high school principal and a school board commissioner, lawyers and clergy, as well as by her reelection to her judicial office after this matter had become public and was well known to the people in her district.

6. The offending conduct here was an isolated incident which we believe would never have happened save for the coming together of a number of events and circumstances, as

- Respondent's affliction with Crohn's disease,
- the onset of an urgent need to use a restroom,
- the inadequacy of the restroom in the court office,
- the need to use the restroom at her home,
- the non-existence of a legal parking space near her home at the time,
- the issuance of the tickets while she used the restroom at home,

— the onset of a painful medical condition requiring treatment including hospitalization and surgery during the critical 15–day period when she would, ordinarily, have paid the tickets.

7.  The offending conduct here was not part of a pattern of misconduct over time; in fact we are aware of no other offending conduct of this Respondent during her service as a judicial officer; there is no evidence that there was; indeed, the Board has not contended that there was.

8.  The evidence (presented by way of testimony at the sanction hearing and by numerous letters presented in lieu of testimony in court) is that Respondent has an exemplary record as a magisterial district judge and in fact conducted an extraordinarily busy court with a short staff.

9.  We are convinced that this judge will not offend again. We hold that not only because of the unlikely confluence of the unlikely events and circumstances described above, but also because of her testimony—her allocution—at the sanction hearing and, as well, the testimony of the witnesses—especially of her father—on that occasion.

10.  Neither intent to defraud nor any element of personal gain played any part in Respondent's decision to dismiss these tickets; but, rather it was Respondent's fear that her affliction would be publicized in the community which was the motivation.

Lastly, in this case we note also that the severe discipline recommended by the Board is not necessary in order to preserve the integrity of our judicial system and the public's confidence in it. Given this Respondent's perfectly unsullied record, her well demonstrated devotion to her job, the high level of respect for her in her community, the mitigating circumstances described herein, the fact that we are talking about parking tickets here and the fact that the Board learned of her conduct *from her*, we are hard put to understand how we would be able to justify the sanctions recommended by the Board, so severe in nature and so inappropriate in this case.

This Order is effective as at May 31, 2013.

